FEDERAL DEPOSIT INSURANCE CORPORATION, in its separate corporate capacity, Plaintiff–Appellee,

v.

AETNA CASUALTY AND SURETY COMPANY, Defendant–Appellant.

No. 89–5866.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 5, 1990.

Decided May 24, 1990.

Deborah C. Stevens, G.W. Morton, Jr. (argued), Judith A. DePrisco, Ellis A. Sharp, John K. King, M. Edward Owens, Jr., Kelly S. Atkins, Gerald L. Gulley, Jr., Morton, Lewis, King & Krieg, Knoxville, Tenn., and Reba Brown, Morton, Lewis, King & Krieg, Nashville, Tenn., for plaintiff-appellee.

Gerard M. Siciliano, Samuel L. Akers, William B. Luther, Phillip J. Parsons, Steven S. Usary, Luther, Anderson, Cleary, Ruth & Speed, Chattanooga, Tenn., Richard J. Phelan (argued), William T. Cahill, Chicago, Ill., and Larry L. Simms (argued), Gibson, Dunn & Crutcher, Washington, D.C., for defendant-appellant.

David L. Buuck, Clairborne, Davis, Buuck & Hurley, Knoxville, Tenn., for defendant.

Before KRUPANSKY and NORRIS, Circuit Judges, and BELL, District Judge [*].

ROBERT HOLMES BELL, District Judge.

Defendant–Appellant Aetna Casualty and Surety Company ("Aetna") appeals from a jury verdict awarding $3,000,000 in compensatory damages and $3,500,000 in punitive damages to plaintiff-appellee, Federal Deposit Insurance Corporation ("FDIC"). The action is premised upon Aetna's refusal to allow FDIC, as receiver for United Southern Bank of Nashville (USBN), to claim coverage under certain bankers blanket bonds. The Court finds that exclusion provisions in the bonds pre-clude the FDIC's action and accordingly reverses.

## I

### Factual Background

USBN was owned in part by C.H. Butcher, Jr. (Butcher) who served as Chairman and Chief Executive Officer until his resignation on May 25, 1982. In April 1983, USBN became insolvent and the FDIC loaned it $25,000,000. As a condition of the loan, the FDIC required USBN to replace the current management. Pursuant to this requirement, Tom Mottern became president of USBN on April 7, 1983. These efforts failed and, on May 27, 1983, the Tennessee Commissioner of Banking closed USBN. The FDIC accepted appointment as receiver on May 27, 1983, and immediately transferred some of USBN's assets to Union Planters National Bank of Memphis. The FDIC purchased the remaining assets.

On February 27, 1983, prior to USBN's closing, Aetna issued two bankers blanket bonds in the total amount of $3,000,000. These bonds provided coverage for losses caused by dishonest acts of employees. Four sections of these bonds are relevant to the issues before the Court. Section 4 states that "[d]iscovery occurs when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known." Section 5(a) states that "[a]t the earliest practicable moment, not to exceed 30 days, after discovery of loss, the Insured shall give Underwriter notice thereof."

The most important sections for purposes of the decision in this case are sections 12 and 13. Although the numbering is slightly different between the two bonds, the wording is identical and the Court shall reference the sections as sections 12 and 13 in conformity to the arguments of the parties. Sections 12 and 13 state:

---

[*] The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

Section 12. *This bond shall be deemed terminated or canceled as an entirety*—(a) 60 days after the receipt by the Insured of a written notice from the Underwriter of its desire to terminate or cancel this bond, or (b) immediately upon the receipt by the Underwriter of a written request from the Insured to terminate or cancel this bond, or (c) *immediately upon the taking over of the Insured by a receiver or other liquidator or by State or Federal officials*, or (d) immediately upon the taking over of the Insured by another institution. The Underwriter shall, on request, refund to the Insured the unearned premium, computed pro rata, if this bond be terminated or canceled or reduced by notice from, or at the instance of, the Underwriter, or if terminated or canceled as provided in sub-section (c) or (d) of this paragraph. The Underwriter shall refund to the Insured the unearned premium computed at short rates if this bond be terminated or canceled or reduced by notice from, or at the instance of, the Insured.

This bond shall be deemed terminated or canceled as to any Employee or any partner, officer or employee of any Processor—(a) as soon as any Insured or any director or officer not in collusion with such person, shall learn of any dishonest or fraudulent act committed by such person at any time against the Insured or any other person or entity, without prejudice to the loss of any Property then in transit in the custody of such person, or (b) 15 days after the receipt by the Insured of a written notice from the Underwriter of its desire to terminate or cancel this bond as to such person.

Termination of the bond as to any insured terminates liability for any loss sustained by such Insured which is discovered after the effective date of such termination.

Section 13. At any time prior to the termination or cancelation of this bond as an entirety, whether by the Insured or the Underwriter, the Insured may give to the Underwriter notice that it desires under this bond an additional period of 12 months within which to discover loss sustained by the Insured prior to the effective date of such termination or cancellation and shall pay an additional premium therefor.

Upon receipt of such notice from the Insured, the Underwriter shall give its written consent thereto: provided, however, that *such additional period of time shall terminate immediately*

(a) on the effective date of any other insurance obtained by the Insured, its successor in business or any other party, replacing in whole or in part the insurance afforded by this bond, whether or not such other insurance provides coverage for loss sustained prior to its effective date, or

(b) *upon any takeover of the Insured's business by any State or Federal official or agency, or by any receiver or liquidator, acting or appointed for this purpose*

without the necessity of the Underwriter giving notice of such termination. In the event that such additional period of time is terminated, as provided above, the Underwriter shall refund any unearned premium.

*The right to purchase such additional period for the discovery of loss may not be exercised by any State or Federal official or agency, or by any receiver or liquidator, acting or appointed to take over the Insured's business for the operation or for the liquidation thereof or for any other purpose.*

(Emphasis supplied.) On May 26, 1983, the day before USBN closed, Mottern directed Allen Haefele, an employee of USBN, to notify the underwriter of USBN's directors' and officers' liability policies of two potential claims against USBN, a suit by South Trust Bank and a potential suit by American Savings and Loan Association. On May 27, 1983, the day USBN was closed, Haefele sent a copy of the above letter to Aetna's agent and notified Aetna that some of the activities mentioned in the letter might involve transactions covered under the bankers blanket bonds. However, neither of those actions is involved in the instant case. This case centers on five

loan transactions not mentioned in the above letters.

With regard to the letter sent to Aetna's agent, Mottern testified that, when the letter was sent, he had a belief that losses would be sustained due to dishonest actions by Butcher. However, he admitted that the letter was sent to Aetna's agent as a precautionary measure and that it did not mention any dishonest acts by Butcher. Mottern admitted that he never discovered any specific dishonest transaction by Butcher prior to the closing of USBN. Mottern further stated that his belief that losses would be sustained due to Butcher's dishonesty was based on the general condition of the bank. The testimony at trial indicated that no employee of USBN had knowledge of any facts indicating dishonesty by Butcher prior to the closing of USBN.

After the FDIC was appointed receiver of USBN, the FDIC sent a letter to Aetna wherein the FDIC acknowledged that the bonds terminated upon appointment of a receiver. The FDIC also notified Aetna that it wished to purchase the additional discovery period provided for in the bonds. Aetna informed the FDIC that, under the terms of the bonds, the FDIC was not entitled to purchase the additional discovery period. In accordance with the policy, Aetna returned the full amount of the premium due.

On January 6, 1984, the FDIC submitted a proof of loss to Aetna setting forth losses arising from dishonest acts of Butcher, including losses on the five loans involved in this case. The FDIC claimed that the losses from these five loans were sustained because Butcher, acting as an employee of USBN, fraudulently failed to disclose that the true purpose of the five loans was to benefit himself or organizations in which he had an interest. At the same time, the FDIC filed seven other bond claims with Aetna regarding losses suffered at other failed Butcher banks. At this point, Aetna's attorney requested and reviewed over 1,000,000 documents, many of which the FDIC contended were not relevant to its claims. Prior to the suit, Aetna did not

attempt to interview any of the USBN officers or directors who had dealt with the loans. After its review, Aetna denied the claims.

On December 24, 1985, the FDIC filed the complaint in this action seeking $3,000,000, the maximum coverage under the bonds. The amount of loss suffered by the FDIC was claimed to be $5,152,383.53. On August 5, 1988, over Aetna's objection, the FDIC amended its complaint to seek compensatory and punitive damages. The claim for punitive damages was grounded on the claim that Aetna's refusal to pay constituted bad faith.

In response to the complaint, Aetna filed affirmative defenses and a counterclaim. The principal affirmative defenses were: (1) USBN had made material misrepresentations in the bond applications rendering the bond void ab initio; (2) pursuant to sections 12 and 13, the bonds terminated immediately upon the takeover by the FDIC; (3) USBN failed to give timely notice of discovery of Butcher's dishonest acts; (4) Butcher so controlled USBN that he was the "alter ego" of USBN so that any act by Butcher was an act of USBN and not the act of an employee; (5) Aetna's agent, owned and controlled by Butcher, knew about the condition of USBN when it procured the bonds and acted in collusion with USBN in obtaining coverage (the "adverse agency" theory). Aetna also raised defenses of gross negligence, estoppel and unclean hands on the part of the FDIC. Aetna's counterclaim alleged that the FDIC had ignored numerous reports of abuses in the Butcher banking system.

Prior to trial, the FDIC presented various motions to strike Aetna's affirmative defenses and counterclaim. In a series of orders, the trial court ordered the counterclaim stricken and also ordered the affirmative defenses, except for those based on sections 12 and 13, stricken.

On March 8, 1989, FDIC filed a motion in limine to exclude any evidence relating to section 13 of the bonds. Aetna opposed this motion by offering excerpts of the deposition of Frank Skillern, general counsel of FDIC, who testified that the FDIC

had approved the form of section 13 prior to its inclusion in Form 24, the form which the primary bond had followed. During trial, the court granted the FDIC's motion. Further, the court ruled that, as a matter of law, sections 12 and 13 were void because they were contrary to public policy. In its charge to the jury, the court instructed that discovery and notice were timely as a matter of law and were not issues in the case.

At the close of the FDIC's proofs, Aetna moved for a directed verdict. The trial court denied the motion. Aetna did not offer any proofs. The jury awarded the FDIC $3,000,000 on the bonds plus prejudgment interest and found that Aetna had acted in bad faith. After hearing proof of Aetna's net worth, the jury awarded the FDIC $3,500,000 in punitive damages. Aetna now appeals the judgment and the Court reverses.

## II

### Analysis

■ The dispositive issue before the Court is whether the trial court erred in ruling that sections 12 and 13 are void as contrary to public policy. The trial court made this ruling in response to FDIC's motion in limine to exclude evidence with regard to sections 12 and 13. In this case, the district court interpreted the bonds and ruled as a matter of law that sections 12 and 13 were void. When the district court construes a contract, such interpretation is a question of law and reviewable de novo by the appellate court. *Messer v. Paul Revere Life Ins. Co.*, 884 F.2d 939 (6th Cir.1989); *Davis v. Sears, Roebuck and Co.*, 873 F.2d 888, 893 (6th Cir.1989); *Weimer v. Kurz–Kasch, Inc.*, 773 F.2d 669, 671 (6th Cir.1985); *Policy v. Powell Pressed Steel Co.*, 770 F.2d 609, 612 (6th Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986).

Aetna argues that the legal precedents have not established any public policy against the provisions of sections 12 and 13. Section 12 provides that the bonds terminate upon the takeover of the insured by the FDIC and section 13 does not allow

the FDIC to purchase additional discovery time. The district court reached the opposite conclusion and held that sections 12 and 13 were contrary to public policy because they "preclude the FDIC from discharging its responsibility in connection with marshalling the assets of the failed bank." The Court reasoned that to give effect to sections 12 and 13 would be to sanction "the bargaining away of FDIC's statutory function upon being appointed as receiver."

In determining whether sections 12 and 13 are contrary to public policy, this Court relies on well-settled principles. In *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945), the Supreme Court stated:

Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. *Vidal v. Philadelphia*, 2 How. 127, 197–98 [11 L.Ed. 205]. As the term "public policy" is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy. *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353 [51 S.Ct. 476, 75 L.Ed. 1112]; *Frost & Co. v. Coeur D'Alene Mines Corp.*, 312 U.S. 38 [61 S.Ct. 414, 85 L.Ed. 500]. It is a matter of public importance that good faith contracts of the United States should not be lightly invalidated. Only dominant public policy would justify such action.

The Fourth Circuit more recently stated:

Were courts free to refuse to enforce contracts as written on the basis of their own conceptions of the public good, the parties to contracts would be left to guess at the content of their bargains, and the stability of commercial relations would be jeopardized.

The power to refuse to enforce contracts on the ground of public policy is therefore limited to occasions where the contract would violate "some explicit public policy" that is "well defined and dominant, and [which] is to be ascertained 'by reference to the laws and legal precedents and not from general consid-

erations of supposed public interests.'" *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 373, 98 L.Ed. 2d 286 (1987) (quoting *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983)); see also *Smithy Braedon Co. v. Hadid*, 825 F.2d 787, 790 (4th Cir.1987). "[T]he usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligations on the pretext of public policy, unless it clearly appears that they contravene public right or the general welfare." *Smithy v. Braedon*, 825 F.2d at 791 (quoting *Baltimore & Ohio Southwestern Railway Co. v. Voigt*, 176 U.S. 498, 505, 20 S.Ct. 385, 387, 44 L.Ed. 560 (1900)). *St. Paul Mercury Ins. Co. v. Duke University*, 849 F.2d 133, 135 (4th Cir.1988). The court went on to state that questions of public policy are to be determined in the first instance by the legislature. *Id.*

12 U.S.C. § 1828(e) provides that the FDIC may require an insured bank to purchase fidelity bond coverage. However, there was no evidence presented that indicated that the FDIC has chosen to exercise that authority. In 1989, Congress amended 12 U.S.C. § 1821 in a manner which appears to indirectly support the validity of sections 12 and 13. 12 U.S.C. § 1821(e)(12)(A) states:

> The conservator or receiver may enforce any contract, *other than a director's or officer's liability insurance contract or a depository institution bond,* entered into by the depository institution notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of a conservator or receiver.

(emphasis supplied.) These statutes do not provide the basis for a "dominant public policy" which would justify voiding sections 12 and 13.

It would appear from § 1828 and the lack of action on the part of the FDIC that the existence of fidelity insurance or its continuance after seizure of a bank by the FDIC has not been a major concern of the government. It is clear from § 1828 that Congress is aware of fidelity insurance and could, if it so desired, require its procurement and could set terms which would avoid the problem presented by sections 12 and 13. Congress chose to specifically exclude fidelity insurance from the prohibition contained in the new section 1821(e)(12)(A). This choice is significant in light of *Sharp v. FSLIC*, 858 F.2d 1042 (5th Cir.1988).

In *Sharp*, the Fifth Circuit found no public policy against a termination provision identical to section 12 in the instant case. That court noted that the FSLIC was authorized by statute to require bond coverage in any form the FSLIC designated. *Id.* at 1048. The Court further noted that "[i]n the case of a receivership or a takeover, the officials who purchased the bond to insure their own honesty are no longer in control of the institution. Takeover or receivership would substantially alter the character of the risk covered by the policy." *Id.* at 1045–46. Finally, the Court stated that the "sole effect of our decision is to require the FSLIC.... to do their homework prior to institution of a conservatorship." *Id.* at 1048. *See FSLIC v. Transamerica Ins.*, 705 F.Supp. 1328 (N.D.Ill.1989). The FDIC also has statutory authority to require bond coverage and could require that such bond continue upon appointment of FDIC as receiver. To rule otherwise would be to force Aetna to take on a risk for which it did not bargain. Insurance policies which have sections limiting coverage are not contrary to public policy where such policies are not required by statute and where the form of coverage has not been mandated. *Continental Cas. Co. v. Allen*, 710 F.Supp. 1088, 1099 (N.D.Tex.1989).

In light of the above, the FDIC's contention that existing laws justify the invalidation of sections 12 and 13 must fail. The dominant public policy exposed by this review is that the parties' freedom of contract must not be disturbed. In response, the FDIC would argue that the parties have unequal bargaining powers because Tennessee law requires the purchase of these bonds. *See* Tenn.Code Ann. § 45–2–403 (1989). However, there is nothing in the statute which would have pre-

vented USBN from bargaining away sections 12 and 13 in return for a different premium amount.

The only cases cited by FDIC sufficiently close to the facts of this case to support the FDIC's public policy contentions are *FSLIC v. Aetna Cas. & Sur. Co.*, 701 F.Supp. 1357 (E.D.Tenn.1988) and *FSLIC v. Oldenburg*, 671 F.Supp. 720 (D.Utah 1987). Both of these Courts reason that, since such exclusions hamper the FSLIC in carrying out its duty as receiver, such exclusions are contrary to public policy. 701 F.Supp. at 1363; 671 F.Supp. at 723–24. This Court finds such reasoning to be contrary to the standard set forth by the Supreme Court in *Muschany, supra.*

Accordingly, in the absence of any clear manifestation of a public policy against sections 12 and 13, the Court holds that these clauses are valid and enforceable.

■ The FDIC argues that the application of sections 12 and 13 is irrelevant because the evidence demonstrated as a matter of law that USBN discovered Butcher's dishonest acts and notified Aetna before the bond would have terminated under section 12. This argument is based on the letter sent to Aetna on May 27, 1983 notifying it of potential liability. The Court finds this argument to be without merit.

Section 4 of the policy states that discovery of a loss occurs when "the insured becomes aware of *facts* that would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred ..." (emphasis supplied.) In interpreting similar clauses, the courts have held that discovery of loss does not occur until the insured discovers facts showing that dishonest acts occurred and appreciates the significance of those facts; suspicion of loss is not enough. *See, e.g., United States Fidelity & Guar. Co. v. Empire State Bank*, 448 F.2d 360, 364–66 (8th Cir. 1971); *FDIC v. Reliance Ins. Corp.*, 716 F.Supp. 1001, 1002 (E.D.Ky.1989). Mottern admitted that, on the date the letter was sent, he had a suspicion that USBN would incur losses due to dishonest acts by Butcher. However, Mottern stated that such suspicions grew from the general condition of USBN and not from knowledge of any facts which indicated Butcher had committed any dishonest acts. The FDIC was unable to provide any witness who could testify to having knowledge, prior to the closing of USBN, of any dishonest acts by Butcher. Finally, the Court notes that the May 27 letter referred to a lawsuit and a potential lawsuit which did not involve any of the losses at issue in the instant case.

Accordingly, the Court finds that the losses about which the FDIC complains were not discovered prior to the termination of the bonds. Since the bonds are valid and discovery was not timely, the judgment of the district court must be reversed.

■ This Court further finds that the trial court abused its discretion in finding bad faith and allowing the imposition of punitive damages. The district court ruled that federal common law should govern the imposition of punitive damages. In a case where FSLIC was setting forth a claim for unlimited punitive damages, a recent federal trial court found that there was "absolutely no persuasive authority for the proposition that the federal courts should create their own law of punitive damages for cases in which FSLIC becomes involved." *FSLIC v. Transamerica Ins.*, 661 F.Supp. 246, 251 (C.D.Cal.1987). This Court finds that none of the cases cited by the trial court or the FDIC support the use of federal common law in this case. Therefore, the Court will look to Tennessee law with regard to punitive damages.

The Supreme Court of Tennessee has stated:

> It is a general rule in Tennessee that punitive damages are only allowable in cases involving torts where the action involves fraud, malice, oppression, or gross negligence. These damages are not generally allowed in cases founded on a breach of contract.

*Bland v. Smith*, 197 Tenn. 683, 277 S.W.2d 377, 379 (1955). The only bad faith alleged in the instant case was the investigatory tactics of Aetna. The decisions on the part of Aetna with regard to how to conduct its investigation of the FDIC's claim were normal and commonly accepted strategical pre-

trial discovery decisions. Further, Aetna was pressing a legitimate contractual defense to FDIC's claim. Such a defense can certainly not be a basis for a bad faith claim. The FDIC argues that Aetna did not provide any evidence to defeat the FDIC's claim of bad faith. The Court finds this argument to be without merit because Aetna was precluded from presenting its proofs by the trial court's many exclusionary rulings.

## III

### Conclusion

The trial court erred in holding that sections 12 and 13 were void as contrary to public policy and erred in holding that discovery and notice were timely as a matter of law. The trial court also abused its discretion in allowing the award of punitive damages. This Court reverses the judgment of the trial court and remands for entry of an order dismissing plaintiff's complaint.