948 F.2d 556
 60 USLW 2343
 CALIFORNIA UNION INSURANCE CO., Plaintiff,
v.
AMERICAN DIVERSIFIED SAVINGS BANK, Defendant,
and
National Union Fire Insurance Company of Pittsburgh,
Pennsylvania; Certain Underwriters at Lloyd's,
London, Defendants-Cross-Defendants-Appellees,
American Diversified Capitol Corporation; Federal Savings
and Loan Insurance Corporation, as Receiver for American
Diversified Savings Bank; American Diversified Investment
Corporation, Defendants-Cross-Claimants-Appellants.
 No. 89-55843.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 7, 1990.
Decided Oct. 30, 1991.
 
 Theodore Russell, Pettit & Martin, San Francisco, Cal., for defendants-cross-claimants-appellants.
 Richard W. Zevnik, Wolf & Leo, Raul L. Martinez, Lewis, D'Amato, Brisbois & Bisgaard, Los Angeles, Cal., for defendant-cross-defendant-appellee Nat. Union Fire Ins. Co. of Pittsburgh, Pa.
 Frederick D. Baker, Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., for defendant-cross-defendant-appellee Certain Underwriters at Lloyd's, London.
 Appeal from the United States District Court for the Central District of California.
 Before HUG, CANBY, and WIGGINS, Circuit Judges.
 HUG, Circuit Judge:
 
 
 1
 This case involves an attempt by the Federal Savings and Loan Insurance Corporation ("FSLIC") to recover under certain fidelity bonds issued to a federally insured thrift, American Diversified Savings Bank ("ADSB"), losses incurred due to the defalcations of two of the principal officers and directors of the failed thrift institution. The district court dismissed the case after granting summary judgment in favor of the insurance companies that had issued the fidelity bonds, National Union Fire Insurance Company ("National Union") and Certain Underwriters at Lloyd's of London ("Lloyd's"). We have jurisdiction to hear this case under 28 U.S.C. § 1291, and we affirm the district court's dismissal.
 
 
 2
 The bonds and policy cover losses "discovered" while the bonds and policy were in force. On appeal, we must decide whether the National Union fidelity bond, by its terms, terminated automatically when the FSLIC took control of ADSB and, if so, whether this provision for automatic termination upon takeover violates federal public policy. Next, we must determine whether FSLIC presented evidence sufficient to avoid summary judgment on the issue of whether "discovery," as that word is defined under the terms of the bond, occurred prior to takeover. If there was no "discovery" prior to takeover, we must then consider appellants' argument that equitable tolling should apply to extend the period for discovery of losses under the bond. Finally, we must address whether the two wrongdoing officers were "employees" of the Insured within the meaning of the comprehensive "dishonesty, disappearance and destruction" ("3-D") policy issued to a subsidiary of ADSB, American Diversified Capital Corporation ("ADCC"), by National Union.
 
 
 3
 This is a diversity action in which the events forming the basis of the lawsuit occurred in California. Therefore, we are required to apply California law. See Stone v. Millstein, 804 F.2d 1434, 1438 (9th Cir.1986). We must review de novo the district court's grant of summary judgment in this case. See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.1987).
 
 I.
 
 4
 FSLIC,[1] as conservator for ADSB, appeals the district court's grant of summary judgment in favor of National Union and Lloyd's. FSLIC seeks recovery under certain fidelity bonds obtained by ADSB from National and Lloyd's.
 
 
 5
 ADSB was a federally insured savings and loan association. Ranbir Sahni owned 96 percent of its stock and Lester Day owned the remaining four percent. Pursuant to the federal regulations in effect during the relevant time periods, 12 C.F.R. § 563.19(a) (1988), ADSB obtained fidelity insurance coverage to provide insurance against loss caused by the dishonest or fraudulent conduct of its employees.[2] In 1983, ADSB purchased a primary Standard Form 22 bond from National Union, providing for $1 million of coverage. Thereafter, by amendment, the two wholly-owned service corporation subsidiaries of ADSB, ADCC and American Diversified Investment Corporation ("ADIC"), became additional insureds under the primary bond issued by National Union. ADSB also obtained $2 million dollars of excess coverage by purchasing a second Form 22 bond from Lloyd's.
 
 
 6
 In addition, ADCC, one of the two wholly-owned subsidiaries of ADSB, purchased an additional $500,000 of fidelity insurance coverage from National Union under the so-called "3-D policy." The 3-D policy covered losses "resulting directly from one or more fraudulent or dishonest acts committed by an employee, acting alone or in collusion with others."
 
 
 7
 On February 14, 1986, after two years of investigation by examiners from the Federal Home Loan Bank Board ("FHLB"), FSLIC was appointed conservator of ADSB. FSLIC maintains that, between January 1984 and February 1986, the period in which the FHLB examiners were investigating ADSB, a number of transactions occurred that may represent losses that are covered by the Form 22 bonds and the 3-D policy.[3] Accordingly, on February 24, 1986, FSLIC notified National Union and Lloyd's that it was making claims against the bonds. National Union relied on the Form 22 bond's "Automatic Termination Provision" to deny the claim. The Automatic Termination Provision provided that the bond would terminate "immediately upon the taking over of the Insured by a receiver or other liquidator or by State or Federal officials." It appears that Lloyd's, whose bond expired by its terms on February 13, 1986, also later denied FSLIC's claim.
 
 
 8
 Subsequently, two of ADSB's other insurers (not involved in this case) filed a declaratory relief action seeking to establish their rights and liabilities with respect to FSLIC, as well as Sahni and Day. On February 16, 1988, FSLIC filed a cross-claim against National Union and Lloyd's seeking recovery under the fidelity bonds and the 3-D policy issued by National Union.
 
 
 9
 Between January and June 1989, the district court granted three separate motions for summary judgment in favor of the insurance companies which effectively disposed of FSLIC's claims against National Union and Lloyd's. The district court determined that the fidelity bonds had terminated automatically upon takeover by FSLIC pursuant to the express terms of the bonds, and that such termination was not in violation of public policy. Moreover, the district court concluded that FSLIC failed to present specific facts showing that there was a genuine issue for trial on whether "discovery" under the bonds occurred prior to takeover by FSLIC, and further ruled that equitable tolling properly would not apply to extend the period for "discovery" of losses under the fidelity bonds. Finally, the court determined that the two wrongdoing officers and directors were not "employees" within the meaning of the comprehensive 3-D policy issued by National Union for the purpose of covering losses resulting directly from one or more fraudulent or dishonest acts committed by an employee.
 
 
 10
 On July 17, 1989, the district court entered final judgment in the case. FSLIC, as conservator for ADSB, filed a timely appeal from the district court's judgment of dismissal.
 
 II.
 
 11
 FSLIC first contends the district court erred when it determined that the National Union Form 22 bond, by its terms, terminated automatically when FSLIC took control of ADSB. FSLIC argues that the language of the termination provision is ambiguous and, therefore, must be construed against National Union. Alternatively, it argues the Automatic Termination Provision is void as contrary to federal public policy because it frustrates the congressional purpose behind receivership with FSLIC as conservator. FSLIC asserts that, even if the Automatic Termination Provision is valid, the bond requires a ten-day notice prior to termination.
 
 1. Automatic Termination Provision
 
 12
 Specifically, we must address whether National Union's Form 22 bond, as amended by Rider 9,[4] terminated automatically upon the appointment of FSLIC as conservator of ADSB on February 14, 1986. An insurance policy is a contract and therefore is enforced in accordance with contract principles. Under California law, the starting place for contract interpretation is with the language of the contract, provided it is "clear and explicit, and does not involve an absurdity." Cal.Civil Code § 1638 (West 1985). "The words used in a policy of insurance are to be construed according to the plain meaning a layman would ordinarily attach to them...." Ray v. Farmers Ins. Exchange, 200 Cal.App.3d 1411, 1416, 246 Cal.Rptr. 593, 595 (1988). Moreover, the words of a contract, including an insurance policy, "are to be understood in their ordinary and popular sense, ... unless used by the parties in a technical sense, or unless a special meaning is given them by usage." Cal.Civil Code § 1644 (West 1985). See Burke Concrete Accessories, Inc. v. Tolson, 27 Cal.App.3d 237, 241, 103 Cal.Rptr. 513, 515 (1972). If the language is unclear or ambiguous rendering its meaning uncertain, "the language of [the] contract should be interpreted most strongly against the party who caused the uncertainty to exist." Cal.Civil Code § 1654 (West 1985). California courts, however, "will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." Reserve Ins. Co. v. Pisciotta, 30 Cal.3d 800, 807, 640 P.2d 764, 767-68, 180 Cal.Rptr. 628, 631-32.
 
 
 13
 Turning to the Automatic Termination Provision in the National Union policy, we note that thus far, only two circuits have addressed issues of interpretation and the public policy considerations of provisions identical to the disputed provision in this case. See Federal Deposit Ins. Corp. v. Aetna Cas. & Sur. Co., 903 F.2d 1073 (6th Cir.1990) (clause does not violate public policy); Sharp v. Federal Savings & Loan Ins. Corp., 858 F.2d 1042 (5th Cir.1988) (clause not ambiguous). The cancellation provision itself is clear and unambiguous, with its effect undisputed. There are four ways in which the bond may be terminated: (a) by the underwriter; (b) by the insured; (c) upon takeover by a receiver, liquidation, or by State or Federal officials; or (d) takeover by another institution.
 
 
 14
 The dispute in this case centers on the Notice Provision in Section 11 of the National Union bond. The relevant language provides:
 
 
 15
 [N]o termination or cancellation of this bond in its entirety, whether by the Insured or the Underwriter, shall take effect prior to the expiration of 10 days from receipt by the Federal Home Loan Bank of which the Insured is a member of written notice of such termination or cancellation....
 
 
 16
 According to FSLIC, the Notice Provision is a contractual condition for cancellation, and as National Union did not comply with the ten-day notice requirement, the Automatic Termination Provision was without effect. FSLIC argues that the use of "whether" implies that the Notice Provision applies to all four ways in which a bond may be terminated, rather than merely to termination or cancellation "by the Insured or the Underwriter."
 
 
 17
 Initially, we note that if the Notice Provision is read without the word "whether"--"no termination or cancellation of this bond in its entirety, ... by the Insured or the Underwriter, shall take effect prior to the expiration of ten days ..."--it is clear that the notice requirement pertains only to terminations by the Insured, ADSB, or the Underwriter, National Union. Next, the inquiry must be whether, in fact, the word "whether" changes the meaning of that phrase so as to include the other types of termination. As discussed, we are constrained by California law to look to the language of the provision and construe the words according to the plain meaning a layman would ordinarily attach to them in their ordinary and popular sense. See Cal.Civil Code §§ 1638 and 1644; Ray, 246 Cal.Rptr. at 595; Burke, 103 Cal.Rptr. at 515.
 
 
 18
 In deciding the meaning of the word "whether," we follow the Fifth Circuit's analysis in Sharp. We note that one dictionary provides that the term "whether" is "[u]sed to introduce the first of a set of possibilities and sometimes a following possibility: Whether he wins or (whether he) loses this is his last fight." The American Heritage Dictionary 1459 (New College Ed.1976) (italics deleted). Applying this definition of "whether" to the Notice Provision results in the following: whether termination is by the Insured or whether it is by the Underwriter, termination takes effect ten days from receipt by the FHLB of the written notice of termination. When construed in this fashion, the language is unambiguous. Another synonym listed is the word "either" and the following illustration is provided: "He passed the test, whether by skill or luck." Id. (Italics deleted). Again, if we use this definition of "whether" to interpret and construe the Notice Provision, the clear meaning would be that "no termination ... of this bond in its entirety either by the Insured or the Underwriter, shall take effect prior to the expiration of ten days from the receipt by [the FHLB] ... of written notice of such ... cancellation." Once again, the meaning is clear and unambiguous.
 
 
 19
 In addition, the court in Sharp examined one other possible definition. That court looked to the same dictionary cited above for the plain meaning of the word "whether." The court applied the first definition listed, which defines "whether" as meaning "if the case is that." See id. (Citing The American Heritage Dictionary (New College Ed.1978)). It then concluded that if this phrase were used in place of the word "whether" there would be no dispute. See id. ("[N]o termination ... of this bond ..., if the case is that it is by the Insured or the Underwriter, shall take effect prior to the expiration of ten days from [receipt of notice by the FHLB].").
 
 
 20
 The examination of each of these possible definitions of the word "whether" all lead us to the logical conclusion that the word "whether" does not broaden the universe to other methods of termination, but rather is merely an unambiguous introduction of the two possibilities involved. The Notice Provision sets forth two situations in which that provision applies--termination or cancellation by (1) the Insured or (2) the Underwriter--regardless of the existence of other methods of termination.
 
 
 21
 This analysis leads us to the same conclusion as that reached by the court in Sharp; namely, that pursuant to the plain language contained in Section 11 of the National Union Form 22 bond, the fidelity bond issued to ADSB by National Union terminated immediately upon takeover by FSLIC. See Sharp, 858 F.2d at 1046; see also Aetna, 903 F.2d at 1076 (noting that faced with an identical termination provision, the FDIC, upon appointment as receiver of a failing bank, sent a letter to Aetna acknowledging that the bonds terminated immediately upon appointment of a receiver).
 
 
 22
 FSLIC also argues that all four types of termination mentioned in Section 11 are pursuant to a contractual agreement entered into between ADSB and National Union and, therefore, are necessarily "by the Insured or the Underwriter." Thus, according to FSLIC, an ambiguity exists in the Notice Provision, which must be construed against National Union, because this is one of at least two reasonable interpretations of the Section 11 Automatic Termination Provision.
 
 
 23
 As discussed, we have determined that the cancellation provision itself is clear and unambiguous, with its effect undisputed. The provision clearly states four distinct ways in which termination or cancellation may occur: (a) by the Underwriter--National Union in this case; (b) by the insured--ADSB in this case; (c) upon takeover by a receiver--the FSLIC in this case; or (d) upon takeover by another institution--not involved here. FSLIC's argument that all four types of termination are by the Insured or the Underwriter requires a strained reading of the language in question. The argument that, under the circumstances of the Form 22 bond, a termination resulting from a takeover must be construed as a termination by the Insured, cannot be supported. Moreover, under principles of California law, an ambiguity may not be created by adopting a strained or absurd interpretation. See Reserve Ins., 30 Cal.3d at 807, 640 P.2d at 767-68, 180 Cal.Rptr. at 631-32. We find no support for FSLIC's argument that all of the types of termination provided for in Section 11 of National Union's bond are read to mean "by the Insured or the Underwriter."
 
 2. Public Policy
 
 24
 FSLIC also argues that the Automatic Termination Provision, Section 11 of the National Union bond, is void as contrary to public policy. FSLIC contends it violates public policy because it "infringes on the power of the FSLIC to act as a receiver for a failed institution."
 
 
 25
 We cannot agree with FSLIC's contention that the Automatic Termination Provision must be declared void as contrary to federal public policy. We are mindful of our responsibility to refrain from enforcing contracts that, as interpreted, violate public policy. See, e.g., W.R. Grace & Co v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of Am., 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). The Supreme Court has made it clear, however, that "[s]uch a public policy ... must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " Id. (quoting Muschany v. United States, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)).
 
 
 26
 In this case, FSLIC required, pursuant to federal regulation, that the participating institutions maintain bond coverage in the form of Standard Form 22, or its equivalent. See 12 C.F.R. § 563.19(a) (1988); see also Sharp, 858 F.2d at 1043. Further, we note that during the February 21, 1989 hearing on National Union's and Lloyd's motion for summary adjudication on the issue of discovery of the claimed loss prior to termination of the bonds, the attorney for FSLIC stated that "[a]s Sharp states, [the Form 22 bond] is negotiated between the American Surety Association and FSLIC." In light of these joint efforts in drafting the bond, FSLIC must be deemed to be aware of the provisions in the bond, and therefore in a position to alter the provisions and/or its regulations in order to provide additional time periods for it to discover losses. Consequently, we conclude that the Form 22 bond, with all of its provisions, is endorsed by the federal government by way of the federal agency responsible for the regulation of the savings and loan industry, namely the Office of Thrift Supervision (which replaced the FHLB), through its requirement that the Standard Form 22 bond be used. See 12 U.S.C. § 1462a; 12 C.F.R. ch. V et seq. (formerly 12 U.S.C. §§ 1437 and 1725; 12 C.F.R. ch. V et seq.). That fact militates against FSLIC's contention that the clause violates public policy.
 
 
 27
 FSLIC relies on section 212(e)(12)(B) of the recently enacted FIRREA statute, Pub.L. 101-73, 103 Stat. 183 (1989), in order to bolster its public policy argument. See Pub.L. 101-73 § 212(a), 103 Stat. 222. FSLIC acknowledges that section 212(e)(12)(A), while otherwise providing the conservator or receiver the power to enforce any contract entered into by the depository institution, notwithstanding any contract termination provision based upon the appointment of a conservator or receiver, excepts depository institution bonds. See Pub.L. 101-73 § 212(a) (incorporating § 212(e)(12)(A)), 103 Stat. 222, 240. FSLIC relies, however, on subsection (B) to provide the support for its public policy argument. Section 212(e)(12)(B) provides that: "No provision of this paragraph may be construed as impairing or affecting any right of the conservator or receiver to enforce or recover under a ... depository institution bond under other applicable law." Pub.L. 101-73 § 212(a) (incorporating § 212(e)(12)(B)), 103 Stat. 222, 240. FSLIC argues that the phrase "other applicable law" refers to federal public policy and FSLIC's statutorily imposed duties. FSLIC contends that the termination provision impairs these statutory duties because it restricts FSLIC, upon appointment as conservator of ADSB, from rights that ADSB itself would have had if FSLIC had not been appointed.
 
 
 28
 We read section 212(e)(12)(A), however, as evidence of Congress' approval of the termination provisions found in the Standard Form 22 bonds. We find support for this by looking first to the statutory provision which provides in part that "[FDIC] may require any insured bank to provide protection and indemnity against ... defalcation...." 12 U.S.C. § 1828(e) (1988). With this legislative enactment in place, and Congress fully aware of fidelity insurance, FIRREA amended section 212(e)(12)(A) to provide, in pertinent part, that: "The conservator or receiver may enforce any contract, other than a director's or officer's liability insurance contract or a depository institution bond, entered into by the depository institution notwithstanding any provision of the contract providing for termination ... upon ... appointment of a conservator or receiver." Pub.L. 101-73 § 212(a) (incorporating § 212(e)(12)(A)), 103 Stat. 222, 240 (emphasis added). See also Aetna, 903 F.2d at 1078. We view this amendment by Congress as recognition of a public policy permitting this termination of the Form 22 bond coverage upon takeover by the government of the failed thrift. Consequently, the authority cited by FSLIC in support of its contention that the Automatic Termination Provision in Section 11 of National Union's Form 22 bond must be declared void as contrary to public policy is simply inadequate to meet the "well defined and dominant" public policy standard set forth by the Supreme Court. See W.R. Grace, 461 U.S. at 766, 103 S.Ct. at 2183.
 
 
 29
 Accordingly, we hold that, pursuant to Section 11 of the bond, the National Union Standard Form 22 bond terminated automatically upon takeover of ADSB by FSLIC on February 14, 1986.[5] Thus, this date now becomes relevant in order to define the bond period: that time period in which the "discovery" of the claimed losses covered by the bond must have occurred.
 
 III.
 
 30
 It is undisputed that FSLIC is eligible to recover for the claimed covered losses provided that there was "discovery" under the bond prior to the date of termination. FSLIC contends the district court erred when it determined that FSLIC failed to present evidence to create a genuine issue of fact as to whether a loss caused by employee fraud was discovered prior to the termination of National Union's and Lloyd's fidelity bonds. Alternatively, FSLIC contends the district court erred when it determined that equitable tolling did not properly apply to extend the period for discovery of losses under the bond.
 
 1. Discovery of Claimed Covered Losses
 
 31
 Because of our determination that National Union's Standard Form 22 bond terminated automatically upon takeover of ADSB by the FSLIC on February 14, 1986, and that Lloyd's Standard Form 22 bond had expired by its terms on February 13, 1986, it is incumbent upon FSLIC to show that "discovery" under the bonds occurred prior to those dates. Specifically, we must determine, in viewing the evidence in the light most favorable to FSLIC, whether it has presented specific facts showing that there is a genuine issue for trial on whether "discovery" under the bonds occurred prior to their respective expiration dates. See T.W. Elec. Serv., 809 F.2d at 630-31. Although this "discovery" threshold is low, FSLIC must nevertheless provide direct evidence relevant to the issue of "discovery." Id. at 630.
 
 
 32
 National Union's and Lloyd's Form 22 bonds have identical discovery provisions. The provision provides that:
 
 
 33
 Discovery occurs when the Insured becomes aware of facts which would cause a reasonable person to assume a loss covered by the bond has been or will be incurred even though the exact amount or details of loss may not be known. Notice to the Insured of an actual or potential claim by a third party which alleges that the insured is liable under circumstances, which if true, would create a loss under this bond constitutes such discovery.
 
 
 34
 There is no dispute that the Insured was ADSB. Moreover, the parties appear to agree that "discovery" could occur if an officer, director, general counsel or some other person in a position of responsibility became "aware of facts which would cause a reasonable person to assume a loss covered by the bond [had] been or would be incurred."
 
 
 35
 In Aetna, the Sixth Circuit stated that "discovery of loss does not occur until the insured discovers facts showing that dishonest acts occurred and appreciates the significance of those facts; suspicion of loss is not enough." Aetna, 903 F.2d at 1079 (citing United States Fidelity & Guar. Co. v. Empire State Bank, 448 F.2d 360, 364-66 (8th Cir.1971)) (other citations omitted). Further, the court concluded that, because FDIC was unable to provide any witness who could testify to having knowledge, prior to the closing of the institution, of any dishonest acts by the Chief Executive Officer, discovery had not occurred as a matter of law. See id.
 
 
 36
 California courts have also defined when discovery of loss occurs in the fidelity bond context. See, e.g., Pacific-Southern Mortgage Trust Co. v. Insurance Co. of N. Am., 166 Cal.App.3d 703, 212 Cal.Rptr. 754 (1985). The court in Pacific-Southern held that "[t]o constitute 'discovery' of the loss, the insured must have more than a mere suspicion that a covered loss has occurred." 166 Cal.App.3d at 709, 212 Cal.Rptr. at 757 (citations omitted). Further, the court found that "[t]here must be discovery of both the loss and the dishonesty." Id. (citing Fidelity Sav. & Loan Ass'n v. Aetna Life & Cas. Co., 647 F.2d 933, 938 (9th Cir.1981)). See also Admiralty Fund v. Peerless Ins. Co., 143 Cal.App.3d 379, 384, 191 Cal.Rptr. 753, 756 (1983) ("Generally, the courts have strictly enforced [discovery of loss] provisions so that neither difficulty in discovering insured losses nor employee concealment excuse the insured's performance.") (citing 13 Couch on Insurance (Rev. ed. 2d 1982) § 46.194, pp. 149-150).
 
 
 37
 Here, the district court granted National Union's and Lloyd's motion for summary judgment on the question of whether "discovery" under the bonds had occurred within the bond periods. It relied in part on FSLIC's initial response to Interrogatory 19 of the first set of interrogatories put forth by National Union and Lloyd's on October 20, 1988. FSLIC's initial response indicated that it discovered the claimed losses on the day the bond was terminated and only after ADSB was taken over by FSLIC.[6] The district court stated that:
 
 
 38
 FSLIC does not contest the fact that the claimed losses were not discovered until after the bond in question had expired. Nor does FSLIC contest the fact that the bond explicitly covers losses discovered during the bond period. FSLIC's argument is that the period for discovery should be equitably tolled....
 
 
 39
 FSLIC argues that the district court's determination that summary judgment was appropriate on this issue of pre-takeover discovery was in error. It asserts that the evidence offered to the district court to support its contention of pre-takeover discovery constitutes the specific fact showing necessary to create a genuine issue for trial on whether "discovery" under the bonds occurred prior to their expiration. We cannot agree.
 
 
 40
 FSLIC's evidence does not create a genuine issue for trial. The record is devoid of any specific evidence indicating that facts supporting a conclusion that an actual loss occurred were brought to the attention of the non-wrongdoing employees. While arguably the evidence indicates the Insured was aware of infractions of banking regulations, and perhaps that internal banking procedures were not followed, there is no indication from the record that the non-wrongdoing employees were "aware of facts which would cause a reasonable person to assume a loss covered by the bond [had] been ... incurred...." Also noticeably absent from the record is any testimony to indicate that a non-wrongdoing employee had knowledge of dishonest acts committed by Sahni or Day. FSLIC does not present any specific facts to indicate any knowledge beyond suspicion on the part of the Insured that covered losses occurred.
 
 2. Equitable Tolling
 
 41
 Alternatively, FSLIC contends that the discovery period under the National Union and Lloyd's bonds should be equitably tolled because Sahni and Day so completely dominated and controlled ADSB and its subsidiaries that the entities lacked the legal capacity to discover losses under the bond. FSLIC maintains that, as the bonds specify that only the Insureds can discover losses under the bonds, the entities must have the legal capacity "to discover" in order for that condition to be met. See Admiralty Fund, 143 Cal.App.3d at 386-89, 191 Cal.Rptr. at 758-59; accord Kehoe v. Peerless Ins. Co., No. 74-1905-MC (1980 WL 1425), Fed.Sec.L.Rep. (CCH) p 97,583 (D.Mass.1980). Consequently, FSLIC seeks to rely on principles of equitable tolling in order to extend the period for discovery of losses under the Form 22 bonds.
 
 
 42
 In Admiralty Fund, the insured maintained that the discovery period, for losses claimed against a fidelity bond, should be equitably tolled "due to the adverse domination and control [of the insured] by the very defalcating 'employees' who caused the losses." 143 Cal.App.3d at 383, 191 Cal.Rptr. at 755. The court held that if "the dishonest president and other high ranking officers controlled the [company's] operations to such an extent as to preclude discovery, the tolling of a discovery of loss provision should be considered." Id. at 389, 191 Cal.Rptr. at 759. The court noted that otherwise, the shareholders would receive no protection under the fidelity policy during the time the wrongdoers controlled the company. Id.
 
 
 43
 FSLIC argues that the evidence presented in this case supports the conclusion that ADSB was adversely dominated and controlled by the wrongdoers, Sahni and Day. Sahni and Day owned all the stock and held key positions. Further, FSLIC argues that the public policy considerations in this instance are even more compelling than those in Admiralty Fund. Thus, the discovery period on the Form 22 bonds should be equitably tolled.
 
 
 44
 We reiterate that in Admiralty Fund, the court began its analysis with the general rule; namely, that "[g]enerally, the courts have strictly enforced such [discovery of loss] provisions so that neither difficulty in discovering insured losses nor employee concealment excuse the insured's performance." Id. at 384, 191 Cal.Rptr. at 756. Only under certain circumstances may this general rule may be set aside and the tolling of the discovery of loss provision considered. See id. at 389, 191 Cal.Rptr. at 759. While this may be appropriate in situations where there is such domination and control as to preclude non-wrongdoing employees from "discovery," it is not warranted under the facts of this case.
 
 
 45
 Here, it is not controverted that there were non-wrongdoing employees who could have discovered the losses prior to takeover. Moreover, FHLB examiners were investigating ADSB for two years prior to the takeover. The regulators were closely overseeing the thrift and had the ability, either independently or through FSLIC, to uncover the facts and notify ADSB of the discovery. We simply do not have an Admiralty Fund situation in which all involved but the wrongdoers were powerless to act in order to prevent the loss of coverage under the fidelity bonds. FSLIC must be charged with knowledge of the requirement that "discovery" occur prior to the termination of the bond period. By failing either to reform the bond or take steps to charge the Insured with knowledge of facts that would constitute "discovery" under the bonds, FSLIC missed its opportunity to claim coverage under the National Union or Lloyd's Form 22 bond in this case. It cannot now look to the equitable tolling doctrine to reallocate the bargained for risks. Accordingly, we reject FSLIC's argument that the "discovery" period should be equitably tolled to extend the period for discovery of losses under National Union's and Lloyd's fidelity bonds.
 
 IV.
 
 46
 Under the 3-D policy issued by National Union, FSLIC is only entitled to coverage if Sahni and Day are deemed "employees" of ADCC as defined under that policy. FSLIC contends the district court erred when it determined that Sahni and Day were not "employees" of ADCC and that no coverage therefore existed for FSLIC under that policy. FSLIC asserts that summary judgment in favor of National Union on the question of coverage under the 3-D policy was improper because: (1) the alter ego doctrine is inapplicable when the wrongdoers do not benefit from any recovery under the policy; and (2) the definition of "employee" in the 3-D policy is a disguised exclusion that is unenforceable under California law.
 
 
 47
 The critical inquiry here is whether the term "employees" was defined under the policy and whether these officers fit within that definition. Examination of the 3-D policy reveals that the term "employee" is defined as:
 
 
 48
 [A]ny natural person (except a director or trustee of the Insured, if a corporation, who is not also an officer or employee thereof in some other capacity) while in the regular service of the Insured in the ordinary course of the Insured's business during the Policy Period and whom the Insured compensates by salary, wages or commissions and has the right to govern and direct in the performance of such service....
 
 
 49
 Thus, Sahni and Day cannot be employees unless the Insured could "govern and direct" them in the performance of their services. It is not disputed that Sahni and Day controlled ADCC and ADSB. While they were not the sole officers of ADCC, they were the principal officers and directors. Furthermore, Sahni and Day owned 100% of the stock of ADSB, of which ADCC is a wholly-owned subsidiary. Because Sahni and Day controlled the Insured, rather than the Insured's controlling them, they do not meet the policy definition of "employees."
 
 
 50
 Moreover, there is a public policy against permitting a corporation to collect insurance for the defalcations of its alter ego. See Kerr v. Aetna Cas. & Sur. Co., 350 F.2d 146, 154-55 (4th Cir.1965); Employer's Admin. Serv., Inc. v. Hartford Accident & Indem. Co., 147 Ariz. 202, 206-08, 709 P.2d 559, 563-65 (App.1985).
 
 
 51
 In Employer's, the issue was whether the fidelity bond, by its terms, indemnified the corporation against the fraudulent and dishonest acts of the corporation's sole officers, directors, and shareholders. The definition of "employee" in that bond was identical to the definition here. See Employer's, 147 Ariz. at 204, 709 P.2d at 561. The court concluded that the insured must have an actual right to govern and direct the employees before their fraudulent acts would be covered by the bond. Otherwise, the coverage under the bond would be for losses resulting from the insured's own dishonest and fraudulent acts. See id. at 205-06, 709 P.2d at 562-63; see also Kerr, 350 F.2d at 154 ("Such a bond is not intended to cover the fraud and dishonesty of men who are in effect the sole stockholders, as well as the only directors of a closely held corporation").
 
 
 52
 We find the reasoning of the courts in Employer's and Kerr to be persuasive and applicable to the instant case. See also Calif.Ins. Code § 533 (West 1972) ("An insurer is not liable for a loss caused by the willful act of the insured...."); Allstate Ins. Co. v. Gilbert, 852 F.2d 449, 451 (9th Cir.1988) ("[S]ection 533 is a part of every insurance contract [issued in California] and is equivalent to an exclusionary clause in the contract itself.") (citations omitted).
 
 
 53
 Finally, FSLIC argues that the definition of "employee" in the 3-D policy is a disguised exclusion, and therefore unenforceable under California law. They rely on Reserve Ins., which provides that ambiguities should be resolved in favor of the insured in order to protect their reasonable expectations. 640 P.2d at 768. Further, an exclusionary clause in an insurance policy must be phrased in clear and unmistakable language and exclusions in a policy will be construed strictly against the drafter. Id.
 
 
 54
 We do not agree with FSLIC's characterization that the definition of "employee" contained in the 3-D policy is a disguised exclusion. It is simply part of the specification of coverage. Thus, we agree with the district court's determination that Sahni and Day were not "employees" under the terms and conditions of the 3-D policy.
 
 V.
 
 55
 Finally, FSLIC contends the district court abused its discretion when it denied FSLIC's motion to retax costs. FSLIC argues that the costs claimed by Lloyd's were costs for the investigation of the claimed losses and not the costs related to litigation. Further, they argue that delay in pursuing discovery resulted in unnecessary costs that should not be awarded.
 
 
 56
 Initially, Lloyd's argues that this court lacks jurisdiction to review the district court's denial of FSLIC's motion to retax costs, as no notice of appeal was filed as to that order. See Fed.R.App.P. 3(c). Rule 3(c) provides in pertinent part, "[t]he notice of appeal ... shall designate the judgment, order, or part thereof appealed from...." Lloyd's also relies on the Supreme Court's holding in Torres v. Oakland Scavenger Co., 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988). In that case, the Court stated that while "a court may construe the Rules liberally in determining whether they have been complied with, it may not waive the jurisdictional requirements of Rules 3 and 4, even for 'good cause shown' under Rule 2, if it finds that they have not been met." Torres, 487 U.S. at 317, 108 S.Ct. at 2409.
 
 
 57
 In this case, FSLIC filed its notice of appeal on July 28, 1989. Lloyd's application to tax costs was heard on July 31, 1989; costs were awarded that same day. On September 18, 1989, the district court denied FSLIC's motion to retax costs.
 
 
 58
 Although it would have been impossible for FSLIC to have filed a notice of appeal from an order that did not exist as of the date of the notice, we determine that the notice of appeal from the judgment incorporates the appeal of the denial of the motion to retax costs. We have held that an order fixing costs in the district court, while an appeal was pending, "should be considered an inseparable part" of the pending appeal. Twentieth Century Fox Film Corp. v. Goldwyn, 328 F.2d 190, 223 (9th Cir.1964).
 
 
 59
 As appellate jurisdiction is present, we will review the district court's denial of the motion to retax costs for an abuse of discretion. Maxwell v. Hapag Lloyd Aktiengesellschaft, 862 F.2d 767, 770 (9th Cir.1988). Costs shall be allowed to the prevailing party unless the court directs otherwise. Fed.R.Civ.P. 54(d).
 
 
 60
 Lloyd's supplied ample evidence to the district court to support the court's position that the discovery conducted was "necessarily obtained for use in the case," pursuant to 28 U.S.C. § 1920. On the basis of this showing by Lloyd's and the authority to award costs granted under Fed.R.Civ.P. 54(d), the district court did not abuse its discretion in denying FSLIC's motion to retax costs. Thus, we affirm the district court's denial of FSLIC's motion to retax costs.
 
 
 61
 The district court's grant of summary judgment in favor of National Union Fire Insurance Company and Certain Underwriters at Lloyd's, London, on FSLIC's cross-claim seeking recovery under certain fidelity bonds obtained by ADSB from National Union and Lloyd's, is affirmed.
 
 
 62
 AFFIRMED.
 
 
 
 [1]
 FSLIC has been abolished by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101-73 § 401(a)(1), 103 Stat. 354 (1989). Pursuant to section 401(f)(2) of that Act, the Federal Deposit Ins. Co. ("FDIC") was substituted as a party to this appeal. Pub.L. 101-73 § 401(f)(2), 103 Stat. 356 (1989). Appellants, however, are collectively referred to as FSLIC throughout the briefs and in this opinion
 
 
 [2]
 Section § 563.19(a) (replaced by 12 C.F.R. § 563.190(a) (1991)) provided in pertinent part: "Each insured institution shall maintain bond coverage with a bonding company acceptable to the Corporation, using the standards set out in § 571.14 of this subchapter, in the form known as Standard Form No. 22 or its equivalent."
 
 
 [3]
 Primarily, the transactions in question involved transfers of funds involving Sahni's real estate interests and the payment of bonuses to officers of American Diversified
 
 
 [4]
 Section 11 of the basic form of National's Form 22 Bond, as amended by Rider No. 9, states in pertinent part:
 This bond shall be deemed terminated or canceled as an entirety (a) [sixty] days after the receipt by the Insured of a written notice from the Underwriter of its desire to terminate or cancel this bond, or (b) immediately upon the receipt by the Underwriter of a written request from the Insured to terminate or cancel this bond, or (c) immediately upon the taking over of the Insured by a receiver or other liquidator or by State or Federal officials, or (d) immediately upon the taking over of this Insured by another institution. If the Insured be a Federal Savings and Loan Association or a state chartered association insured by the Federal Savings and Loan Insurance Corporation, no termination or cancellation of this bond in its entirety, whether by the Insured or the Underwriter, shall take effect prior to the expiration of 10 days from the receipt by the Federal Home Loan Bank of which the Insured is a member of written notice of such termination or cancellation unless an earlier date of termination or cancellation is approved by said Federal Home Loan Bank.
 
 
 [5]
 We agree with the district court's determination that the National Union bond also terminated as to the two wholly-owned subsidiaries, ADCC and ADIC. First, these subsidiaries were, in effect, taken over as assets of ADSB. Furthermore, we are persuaded by the Termination Provision in Section 11 which provides that the "bond shall be deemed terminated ... as an entirety." This language is clear and unambiguous and its effect cannot therefore be reasonably disputed
 
 
 [6]
 Interrogatory 19 asked the following: "State separately, with respect to each matter or transaction ... whether you presently contend that the fraudulent or dishonest acts ... giving rise to the loss claimed to have been sustained in connection with such matter or transaction was discovered on or before February 14, 1986." FSLIC responded, in pertinent part, as follows: "On February 14, 1986, i.e., when the [FHLB] appointed FSLIC conservator for [ADSB], FSLIC ... became aware of facts which could cause a reasonable person to assume that losses covered by the bond had been incurred, even though the exact amount or details of the losses may not then have been known."
 Subsequently, FSLIC amended its response to Interrogatory 19 to indicate that the claimed covered losses were discovered prior to its takeover on February 14, 1986.