**INTERSTATE PRODUCTION CREDIT ASSOCIATION, a federally chartered corporation, Plaintiff,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, a California corporation, Defendant.**

**Civ. No. 87–1417–FR.**

United States District Court, D. Oregon.

March 23, 1990.

**226**

Barry P. Caplan, Richard G. Spier, Sussman, Shank, Wapnick, Caplan & Stiles, Portland, Or., for plaintiff.

James L. Knoll, Loren D. Podwill, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, Or., for defendant.

## OPINION

FRYE, District Judge:

The matters before the court are the cross-motions for summary judgment of plaintiff, Interstate Production Credit Association (IPCA), (# 101) and defendant, Fireman's Fund Insurance Company (Fireman's), (# 104). Fireman's also moves, in the alternative, for partial summary judgment on issues related to damages.

## BACKGROUND

IPCA seeks payment of approximately ten million dollars under a Farm Credit Services Blanket Bond, Bond No. HF 640 1060 (the Bond), issued by Fireman's to IPCA's predecessor in interest, Northwest Livestock Production Credit Association (NLPCA). IPCA is a non-profit corporation under the Farm Credit Act of 1971, 12 U.S.C. §§ 2001 *et seq.* IPCA provides agricultural loans to its members throughout the Northwest, as did its predecessor, NLPCA.

The Bond covers, among other things, losses incurred through the dishonest or fraudulent acts of the employees of IPCA. IPCA alleges that it suffered a loss in excess of ten million dollars by reason of falsified loan documents which John C. Courtright submitted on behalf of Courtright Cattle Company (CCC) while Courtright was a director of NLPCA.

In November, 1988, this court granted Fireman's motion to bifurcate the issues relating to coverage for the purposes of discovery and motions for summary judgment. On March 3, 1989, the court denied the cross-motions of the parties for summary judgment on certain coverage issues. In that opinion, the court ruled that the definition of a covered employee in the Bond is not ambiguous and that the definition of employee covers directors when they act as directors as well as when they act as officers or employees. *Interstate Prod. Credit Ass'n v. Fireman's Fund Ins. Co.*, 706 F.Supp. 1405, 1407 (D.Or. 1989). The court found that there were genuine issues of material fact as to 1) whether Courtright committed any dishonest or fraudulent acts while acting in his capacity as a director of NLPCA; and 2) whether Courtright used his position as a member of a loan committee for NLPCA or his status as a director of NLPCA to influence the processing and extensions of the loans made to CCC. *Id.*

## UNDISPUTED FACTS

The Bond became effective January 1, 1984 for covered losses "sustained by the insured at any time, but discovered during the policy period or extended discovery period." The Bond was cancelled by Fireman's effective June 22, 1985. At that time, IPCA exercised an option to elect a twenty-four month extended discovery peri-

od within which to discover any loss sustained while the Bond was in effect.

At all relevant times, Courtright was an officer of CCC and controlled the actions of CCC. Courtright was a guarantor on the loans and loan extensions made by NLPCA to CCC. CCC first received loans from NLPCA in the 1970's. Courtright was first elected to the board of directors of NLPCA on February 19, 1982. As of that date, the balance of the loan to CCC, exclusive of accrued interest, was $4,722,225. Courtright remained a director of NLPCA until the Fall of 1985, when he was elected Chairman of the Board of the Associate Directors for Farm Credit Services, Portland.

Courtright has admitted that he misrepresented the size of the cattle inventory of CCC in documents submitted to NLPCA. These misrepresentations of its collateral enabled CCC to secure extensions of its loans and increases in the loan limits. Courtright has stated that he began to inflate the cattle inventory of CCC in late 1981, but he has also stated that he began to inflate the cattle inventory of CCC in late 1984 or early 1985.

Courtright's fraud came to light after he disappeared in January, 1986. As soon as it learned of Courtright's disappearance, IPCA took various steps to recover on its loans to CCC. IPCA gave Fireman's notice of its claim on the Bond in February, 1986 and submitted its proof of claim to Fireman's in January, 1987. Courtright was located and arrested approximately six weeks after his disappearance and subsequently plead guilty to two federal criminal charges which alleged that he misrepresented CCC's cattle collateral on or about November 1, 1985 and December 1, 1985.

## CONTENTIONS OF THE PARTIES

IPCA moves for summary judgment on the ground that as a director Courtright had a duty to immediately report any information known to him regarding the commission of fraud by a borrower, and that his failure to report the fraud by CCC violated that duty. IPCA argues that as a matter of law the fraud of Courtright caused a covered loss to IPCA in a readily determinable amount.

In response to IPCA's motion, Fireman's contends that Courtright did not commit any dishonest or fraudulent acts while acting in his capacity as a director of NLPCA and that the regulations governing the directors of IPCA, specifically 12 C.F.R. § 612.2135, relieve a director of all the functions and duties of a director with respect to his own loans. Fireman's argues that there is no causal link between the acts performed by Courtright as a director and the losses caused by CCC's misrepresentation of its collateral because a borrower who is not a director could commit the same fraud.

Fireman's also argues that IPCA was aware of facts which should have made it aware of the fraud or caused it to inquire as to the possibility of fraud before the end of 1985, so that the notice of claim and proof of claim filed by IPCA were untimely filed. Fireman's argues that IPCA breached the implied covenant of good faith and fair dealing in the Bond by failing to follow its own regulations, policies and credit requirements with respect to the loan to CCC. Fireman's argues that even if IPCA establishes a covered loss, Fireman's is not liable under the Bond because IPCA has other insurance which will provide coverage.

IPCA replies in support of its motion that Courtright's common law duty as a director was not extinguished by the federal regulations; that Courtright's silence in his capacity as a director of NLPCA allowed him to commit fraud as a borrower; that there is no evidence which would permit an inference of constructive knowledge of the fraud on the part of NLPCA or IPCA before January, 1986; that there is no evidence which could support a claim of breach of the covenant of good faith and fair dealing on the part of NLPCA or IPCA; that Fireman's is trying to raise a defense of comparative negligence, which is inapplicable to this claim; and that the "other insurance" provision of the Bond is not applicable.

Fireman's moves for summary judgment on the grounds that 1) as a matter of law, Courtright did not perform any function as a director that was covered under the Bond; and 2) there was no loss sustained by IPCA that was covered by the Bond.

In the alternative, Fireman's seeks a partial summary judgment ruling that 1) losses from any money loaned to CCC after the Bond was cancelled on June 22, 1985 are not covered by the Bond; 2) the loss sustained by IPCA that is covered by the Bond is no more than $1,534,639; 3) any covered loss on the loan to CCC must be reduced by the amount of lost "potential income" represented by the $4,551,691 in loan proceeds used to pay accrued interest; and 4) any loss on the loan to CCC which is covered must be reduced by the account balance that existed immediately prior to Courtright becoming a director, i.e., $4,722,225 plus accrued interest.

IPCA responds that, as argued in its motion, Courtright had a duty as a director to disclose the fraud committed by CCC. IPCA also contends that there is evidence permitting the inference that Courtright used his position as a director to improperly influence the handling of the loan to CCC. With regard to the damage issues raised by Fireman's, IPCA argues that 1) there was no novation after cancellation of the Bond but only a continuing loan relationship; 2) Fireman's is not entitled to credit for loan payments made after the cancellation date, June 22, 1985; 3) no additional deduction should be made for accrued interest; and 4) the claim does not include losses arising before Courtright became a director.

Fireman's replies in support of its motion that there is insufficient evidence to create a genuine issue of material fact regarding IPCA's contention that Courtright used his position as a director to influence the handling of the loan to CCC. As to the remaining issues, Fireman's largely repeats and reinforces the arguments made in its prior memoranda.

Each of the parties continues to maintain that it is entitled to summary judgment and that genuine issues of material fact preclude summary judgment in favor of the opposing party.

## APPLICABLE LAW

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir.1976). Where different inferences can be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir.1981). " '[T]he [district] judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " *Sorosky v. Burroughs Corp.*, 826 F.2d 794, 798 (9th Cir. 1987).

## ANALYSIS AND RULING

The major issue raised in the motions for summary judgment of both IPCA and Fireman's is whether Courtright's fraudulent acts are, as a matter of fact and law, covered by the language of the Bond. If Courtright's fraudulent acts are not covered, there can be no liability under the Bond. If they are covered, the court must proceed to the other issues raised by Fireman's.

As this court ruled in its earlier decision, Courtright's actions are not covered by the Bond unless he fits into the definition of "employee" set out in section A.1 of the Bond: "A director, officer or other employee of the Insured, while employed in, at, or by any of the Insured's offices or premises covered hereunder." *Interstate Prod.*

*Credit Ass'n v. Fireman's Fund Ins. Co.,* 706 F.Supp. 1405, 1406 (D.Or.1989).

In its decision on the first motion for summary judgment, the court ruled:

The court finds that the Bond is not ambiguous, and that the meaning of subsection 1) can be determined from the face of the Bond. The court finds that subsection 1) covers directors while they are performing functions as directors, in contrast to subsection 2), which covers directors who perform acts normally done by officers or employees. This interpretation gives meaning to both subsections.

Fireman's Fund contends that Courtright made the fraudulent representations on behalf of CCC while acting in the capacity of a borrower from NLPCA and not as a director of NLPCA. IPCA argues that even if Courtright was not acting in his capacity as a director of NLPCA when he made the fraudulent representations, he violated his duty as a director by concealing the false representations and thus committed dishonest or fraudulent acts while employed as a director of NLPCA.

The court finds that there is a genuine issue of material fact on the issue of whether Courtright committed any dishonest or fraudulent acts while acting in his capacity as a director of NLPCA because the record is inconclusive regarding the duties performed by directors of NLPCA, including Courtright, during the relevant time period.

In addition, there is evidence that Courtright was a member of a loan committee for NLPCA. There is an issue of fact as to whether Courtright used his position as a member of a loan committee for NLPCA or his status as a director of NLPCA to influence the handling of the loans and extensions of loans to CCC.

706 F.Supp. at 1407.

IPCA first contends that as a matter of law Courtright's fraud is covered by the Bond because Courtright violated his duty as a director to report any fraud being committed by a borrower—in this case, Courtright's own company, CCC. IPCA also contends that there are material issues of fact on the question whether Courtright used his position as a director to influence the loan approval process or to influence the extension of loans made to CCC.

The parties have thoroughly briefed and discussed IPCA's argument that Courtright's fraud is covered by the Bond. Both agree that the court may rule as a matter of law on this point. IPCA relies on decisions under the common law and certain sections of the C.F.R. which set out the standards applicable to directors of production credit associations (PCA's). IPCA cites cases from various jurisdictions which support the general proposition that officers or directors of a bank or corporation have a fiduciary duty to disclose fraud of which they are aware. *See, e.g., Wooddale, Inc. v. Fidelity and Deposit Co. of Maryland,* 378 F.2d 627, 634 (8th Cir.1967) (fraud by Caldbeck, the president of a corporation who was also an independent contractor, was covered under a fidelity bond).

■ However, not every breach of the fiduciary duty of a director is necessarily covered by the terms of a fidelity bond. The two cases cited by IPCA which concern fidelity bonds rely on the language used in those particular bonds. *See Wooddale, supra,* 378 F.2d at 630; *Maryland Casualty Co. v. First Nat'l Bank,* 246 F. 892 (5th Cir.1917). Likewise, this court must determine the extent of the coverage of the bond in this case from the language of the bond.

■ The Bond covers losses caused by the dishonesty or fraud of "[a] director ... of the Insured, *while employed in, at, or by* any of the Insured's offices or premises covered hereunder." (Emphasis added.) This court has already ruled that in order to fit within that definition, Courtright must have been performing functions as a director or acting in his capacity as a director when he committed the fraud.

The evidence is uncontradicted that Courtright submitted the fraudulent collateral reports in his capacity as a borrower and that any borrower could have committed fraud by this means. *See, e.g.,* Fire-

man's Exhibit R, Deposition of Emmet Len Mascall (the president of the NLPCA), at 150–51. There is no evidence that it was necessary for Courtright to be in the position of a director in order to commit his fraud.

IPCA argues that by keeping silent as a director about the fraud that he committed in his capacity as a borrower, Courtright continually breached his duty as a director to disclose wrongdoing. However, under this logic, any undisclosed wrongdoing by a director would be covered by the Bond, solely due to the wrongdoer's status as a director. If that was the intent of the parties, the Bond could have stated simply that directors are covered, rather than using the limiting phrase "while employed in, at, or by any of the Insured's offices or premises."

The court finds that as a matter of law the Bond must reasonably be interpreted to require a causal connection between Courtright's position as a director and the commission of the fraud. In *Wooddale, supra,* the Eighth Circuit found it significant that Caldbeck was enabled to commit fraud by his position as president of the corporation. 378 F.2d at 633.

The requirement of a causal connection is bolstered in this case by Section 2.D of the Bond, which excludes losses on loans unless such losses are covered under Insuring Agreements A (fidelity), D (forgery) or E (securities forgery). In *Third Fed. Sav. & Loan Ass'n v. Fireman's Fund Ins. Co.,* 548 F.2d 166, 172 (6th Cir.1977), the Sixth Circuit found, under similar bond language, that the losses claimed by the insured were not caused by fraud which was covered by the bond.

As discussed above, there is no evidence which suggests that Courtright's fraud was made possible by his position as a director; rather, Courtright's fraud was of a type which could have been committed by any borrower.[1]

The sections of the C.F.R. cited by IPCA do not change this result. For the most part, these sections describe the general standards of fiduciary duty applicable to directors of PCA's. *See* 12 C.F.R. §§ 612.-2135, 612.2140 and 617.7110. These standards are consistent with common law fiduciary standards. However, as noted above, not every breach of fiduciary duty creates a covered loss under the Bond.

Moreover, section 612.2140 actually militates against a finding that Courtright was performing functions as a director with respect to his own loans. Section 612.2140 provides, in pertinent part:

(a) To avoid conflicts of interest, a director shall not:

. . . .

(2) Participate, directly or indirectly, in deliberations on any question affecting, directly or indirectly, the interest of the director, a relative of the director, or any entity controlled by the director.

This language does not relieve a director of liability for any breach of the rules against conflicts of interest, but it does indicate that PCA's are organized so as to remove directors from involvement with or influence upon decisions concerning their own loans.

The evidence produced by the parties supports this conclusion. Numerous witnesses testified that directors were not assigned responsibilities pertaining to their own loans, and that it was the practice for directors, including Courtright, to leave meetings when their own loans came up for discussion. *See* Fireman's Exhibit R, Mascall Depo. at 41–43; Fireman's Exhibit S, Deposition of Deke Tietze (vice-president of NLPCA), at 31, 158. This practice was required by section 640 of the bylaws of NLPCA and the bylaws of IPCA. *See* Fireman's Exhibits H and I. An additional safeguard was the added scrutiny provided by the requirement that loans to directors receive prior approval from the Federal Interstate Credit Bank (FICB).

In its second argument, IPCA contends that despite these policies, on several occasions Courtright used his position on the board of directors to indirectly influence

---

1. IPCA's second argument, that Courtright used his position as a director to indirectly influence the treatment of his loans, is discussed separately below.

the treatment of his loans, specifically to cover up his fraud and to avoid exposure. IPCA has conceded that Courtright did not use his position on the loan committee to directly influence the handling of his loans and loan extensions. *See* Fireman's Exhibit E, IPCA's response to Fireman's second set of interrogatories, No. 7.

IPCA cites four occasions on which it contends Courtright used his position as a director to influence the treatment of his loans. First, IPCA submits the deposition testimony of Edward L. Cox, an employee of the FICB, who describes a meeting of the board of directors of NLPCA in the late Fall of 1984. Cox testified that during a discussion concerning the requirement that borrowers fill out monthly collateral forms Courtright stated "that [the collateral form] was the best tool he ever had, because it made him sit down and keep better track of his cattle." Cox Depo. at 159. Cox also testified that Courtright said "when they started making me use this form, it helped me in my business in that I had to sit down every month and complete it." *Id.*

IPCA argues that because Courtright failed to reveal his misrepresentations on the collateral forms, these comments were made to lull the others present into a sense of security and to influence the handling of the loan to CCC, and thus were a blatant misuse of Courtright's position as a director.

Fireman's responds that if read in context, the testimony of Cox indicates that Courtright's comments did not lull the directors into a sense of security, but rather put the directors on notice that the credit administration practices of NLPCA could be improved. Fireman's argues that even if Courtright's comments helped to bolster his reputation, the undisputed testimony of Cox and other officials is that they were not aware of any attempt by Courtright to influence them in the handling of the loan to CCC, and that they were not influenced in any way by Courtright's status as a director. *See, e.g.,* Fireman's Exhibit U, Cox Depo. at 119–20.

The second example is taken from the deposition testimony of Mascall and Tietze to the effect that at a shareholders' meeting on February 8, 1985, Courtright stated that he needed to know whether his loan would be renewed before he would allow himself to be renominated for the position of director. Mascall Depo. at 160–61; Tietze Depo. at 133–34. Tietze testified that he made a call to the FICB in Spokane, Washington, and that the FICB called back with prior approval for Courtright's loan the same day. Tietze Depo. at 134.

IPCA contends that this evidence creates an inference that Courtright, as a director, was able to pressure the FICB to act on his loan faster than prevailing procedures permitted and thus avoid the kind of scrutiny that might have resulted in the discovery of his misconduct.

Fireman's responds that IPCA's evidence does not support an inference that Courtright made an implied threat which influenced the approval of his pending loan application. Fireman's points to evidence that before the FICB approved the loan to CCC in February, 1985, CCC received full scrutiny from the loan committee of the FICB, comprised of Cox, Herrin and Gard. *See* Fireman's Exhibit U, Cox Depo. at 119–20; Fireman's Exhibit V, Herrin Depo. at 18; Fireman's Exhibit W, Gard Depo. at 19–20.

The third example is derived from the minutes of a board meeting held on February 9, 1985, which state that the board discussed in detail the poor service received by some loans due to the practice of the FICB to repeatedly request more information on loans and to delay a decision on such loans. The minutes state:

Therefore, it was moved by W.H. Steiwer, Jr. and seconded by Albert Treiber that the Chairman write a letter to President Krueger detailing the length of time to complete Courtright Cattle Company's loan approval, and the many additional requests for information that were made on this loan—and also the service we have been receiving on other prior approval loans. Motion carried unanimously.

Affidavit of Danelle D. Blangeres, Ex. 1, p. 6.

IPCA contends that Courtright's presence at this meeting and his participation in the unanimous vote establish that Courtright used his position as a director to cover up his dishonesty.

Fireman's responds that there is no evidence that Courtright actually participated in any discussion relating to CCC or in the vote regarding a letter to FICB. Fireman's relies on the uncontradicted testimony of Mascall and Tietze, who state that whenever the loan to CCC was discussed at a director meeting, Courtright excused himself from the meeting. Fireman's Exhibit R, Mascall Depo. at 41–43; Fireman's Exhibit S, Tietze Depo. at 31, 158.

The fourth example is taken from the deposition testimony of Robert L. Damon, a regional credit officer for the FICB, who states that at a meeting of PCA's held in Wilsonville, Oregon in the spring of 1985, the topic was the possibility of mergers between various PCA's. Damon states: "I remember during the merger discussions, Mr. Courtright getting up and then telling the audience there that the only person he would allow to be his field man was George Rugg." Damon Depo. at 35. Rugg, who reported to the IPCA office in Portland, Oregon but actually worked out of the Moses Lake, Washington area, near CCC's operations, was responsible for performing the on-site verifications of CCC's collateral.

IPCA contends that the deposition testimony of Damon supports the inference that Courtright was able to misuse his position as a director to see to it that no reorganization or changes in personnel were put into effect that would result in someone other than Rugg being assigned the responsibilities of on-site verification.

Fireman's responds that IPCA gives no indication of how Courtright's comment at the meeting of PCA's could have influenced the handling of his loans, and that IPCA submits no other evidence that Courtright was able to use his influence to prevent any reorganization or changes in personnel. Fireman's relies on Rugg's testimony that Courtright never made any attempt to in-fluence his handling of the loan and that Rugg was not influenced by Courtright's status as a director. Fireman's Exhibit T, Rugg Depo. at 28–31.

As to all of the examples submitted by IPCA, Fireman's argues that this evidence cannot support an inference that Courtright's actions actually influenced the handling of loans or loan extensions because every witness who had involvement in the approval process for loans to CCC or loan extensions unequivocally testified that he was not influenced in any way by Courtright in deciding to approve loans or loan extensions. *See* Fireman's Exhibit R, Mascall Depo. at 41, 56, 61–62, 64; Fireman's Exhibit S, Tietze Depo. at 29–34; Fireman's Exhibit T, Rugg Depo. at 28–31; Fireman's Exhibit U, Cox Depo. at 119–20; Fireman's Exhibit V, Herrin Depo. at 20–21; Fireman's Exhibit W, Gard Depo. at 19–20; Fireman's Exhibit X, Burge Depo. at 23–25; Fireman's Exhibit Y, Morton Depo. at 54–56, 59–60; Fireman's Exhibit Z, Tangvald Depo. at 14–17.

Fireman's argues that there is no evidence which supports a causal connection between the actions of Courtright as a director and the losses of IPCA. As discussed above, this causal connection is a requirement for coverage of a loss under the Bond. IPCA does not say how the four incidents affected the approval of the loans or loan extensions to CCC in February or November, 1985. IPCA does not identify any persons who were influenced by the actions of Courtright.

On a motion for summary judgment, the opponent "must come forward with 'specific facts showing that there is a *genuine issue for trial.'*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e) (emphasis in *Matsushita*)). The opponent of the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356.

The evidence submitted by IPCA could establish, at most, that Courtright made occasional references to the loans of CCC

and made statements designed to bolster his reputation while performing functions as a director. In response to the unanimous and uncontradicted testimony of the officials of NLPCA and FICB that they were not influenced by Courtright, IPCA has produced no evidence which could support an inference that Courtright, acting as a director, influenced the treatment of loans or the loan extensions to CCC.

Accordingly, there are no genuine issues of material fact as to coverage of the losses of CCC under the Bond. The court finds that as a matter of law the losses were not caused while Courtright was performing functions as a director or acting in his capacity as a director. Due to this conclusion, the court does not reach the issues raised in Fireman's alternative motion for partial summary judgment.

## CONCLUSION

The motion for summary judgment of Fireman's (# 104) is granted. The motion for summary judgment of IPCA (# 101) is denied.