**INTERSTATE PRODUCTION CREDIT ASSOCIATION, a federally chartered corporation, Plaintiff,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, a California corporation, Defendant.**

**Civ. No. 87–1417–FR.**

United States District Court, D. Oregon.

April 3, 1992.

Barry P. Caplan, Richard G. Spier, Sussman, Shank, Wapnick, Caplan & Stiles, Portland, Or., for plaintiff.

James L. Knoll, Loren D. Podwill, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, Or., for defendant.

## OPINION

FRYE, District Judge:

The matters before the court are 1) plaintiff's motion for summary judgment upon remand from the United States Court of Appeals for the Ninth Circuit (# 101); and 2) defendant's corrected motion for summary judgment and alternative motions for partial summary judgment upon remand from the United States Court of Appeals for the Ninth Circuit (# 105).

## BACKGROUND

Plaintiff, Interstate Production Credit Association (IPCA), filed this action against defendant, Fireman's Fund Insurance Company (Fireman's Fund), seeking to recover, under the special terms of its fidelity bond, for losses suffered by IPCA as a result of loans made to a corporation controlled by John Calvin Courtright, who was also a director of IPCA. IPCA alleges that Courtright failed to disclose to IPCA that, while he was acting as an officer of the borrowing corporation, Courtright Cattle Company (CCC), he had falsely represented the amount of collateral that CCC had when he obtained the loans.

This court held in a prior opinion that there was no casual connection between Courtright's position as a director of IPCA, the commission of the fraud by Courtright, and the ultimate loss to IPCA. *Interstate Prod. Credit Ass'n v. Fireman's Fund Ins. Co.*, 736 F.Supp. 225 (D.Or.1990). On appeal, the Court of Appeals reversed this court's grant of summary judgment in favor of Fireman's Fund. The Court of Appeals concluded that Courtright had a duty to disclose his dishonest acts and found that "Courtright's failure to disclose the fraud perpetrated in obtaining loans, and loan extensions, for CCC caused a direct financial loss to IPCA." *Interstate Prod. Credit Ass'n v. Fireman's Fund Ins. Co.*, 944 F.2d 536, 539 (9th Cir.1991).

The Court of Appeals remanded the action to this court with directions to enter an order granting partial summary judgment in favor of IPCA on the issue of whether Fireman's Fund is liable under the Bond for Courtright's failure to disclose his knowledge of the fraudulent representations in CCC's loan applications.

Upon remand, this court must determine a number of issues not addressed by this court or the Court of Appeals relating to affirmative defenses and damages.

## CONTENTIONS OF THE PARTIES

IPCA contends that the Court of Appeals directed entry of partial summary judgment in its favor as to the issue of liability, and therefore this court should now find that IPCA is entitled to damages as a matter of law in the amount it claims or, alternatively, the case should proceed solely on one or more issues pertaining to damages. IPCA contends that it is entitled to summary judgment in the amount of $9,319,908, plus prejudgment interest and statutory interest.

Fireman's Fund contends that its affirmative defenses of discovery and notice, and of breach of the covenant of good faith and fair dealing, and of other insurance raise questions of fact which must be determined by a jury, and that summary judgment for IPCA should not be granted.

Fireman's Fund further contends that it is entitled to summary judgment in its favor on the grounds that IPCA sustained no losses prior to June 22, 1985, and therefore is not entitled to recover any damages on the fidelity bond as a matter of law. In the alternative, Fireman's Fund contends that it is entitled to partial summary judgment regarding the measure of damages that IPCA is entitled to recover on the fidelity bond.

## APPLICABLE STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact.

Once the initial burden of the moving party is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The non-moving party must make a sufficient showing on all essential elements of the case with respect to which the non-moving party has the burden of proof. *Id.*

■ The decision faced by the court is essentially the same decision faced by a court on a motion for a directed verdict—that is, whether the evidence on the motion for summary judgment presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). If reasonable minds could differ as to the conclusions drawn from the evidence in the record, the motion for summary judgment should be denied. *Id.*

## ANALYSIS

### *Affirmative Defenses*

Fireman's Fund has raised three affirmative defenses which it contends defeat coverage under the fidelity bond: 1) discovery and notice; 2) breach of the covenant of good faith and fair dealing; and 3) other insurance.

IPCA argues that these affirmative defenses are based upon the general proposition that IPCA was negligent or otherwise culpable in allowing Courtright to perpetrate a fraud; that IPCA violated its duty of good faith and fair dealing in failing to prevent the loss; and that IPCA failed to give timely notice when it knew or should have known what Courtright was doing.

IPCA argues that these affirmative defenses are tantamount to alleging that the negligence of an insured under first party insurance coverage somehow defeats coverage.

IPCA argues that the facts and the law do not support these claims of Fireman's Fund, and that IPCA is entitled to judgment in its favor as to all of the affirmative defenses raised by Fireman's Fund.

1. Discovery and Notice

■ Section 3 of the Bond regarding notice of loss provides, in relevant part:

At the earliest practicable moment after discovery of any loss hereunder Farmbank Risk Management Service shall give to the Underwriter written notice of any loss and, within six months after any officer of the Insured not acting in collusion with one or more employees shall learn of such loss, the Insured shall file with the Underwriter an itemized Proof of Loss with full particulars duly sworn to.

Suit may be brought against the Underwriter ... but no action or proceeding shall be brought under this bond in regard to any loss, unless begun within twenty-four (24) months after any officer of the Insured not acting in collusion with one or more employees shall learn of such loss.

Exhibit C to Defendant's Statement of Material Facts, p. 10.

Section 11 of the Bond regarding termination or cancellation provides, in relevant part:

As soon as any officer of any one of the Insured, not acting in collusion, shall learn of any dishonest or fraudulent act on the part of any employee this bond shall terminate as to such employee with respect to the Insured and the Underwriter shall not be liable to such Insured for any loss subsequently caused by such employee.

*Id.* at 14.

IPCA argues that there are no facts in this record to support any conclusion but that there was no suspicion of fraud on the

part of IPCA until Courtright disappeared in January, 1986. IPCA asserts that it gave notice of the losses to Fireman's Fund at the earliest practicable moment after learning of Courtright's fraud. IPCA asserts that this affirmative defense should be dismissed because there are no facts to support the claim of Fireman's Fund that someone at IPCA had actual knowledge of losses or had a suspicion of fraudulent behavior on the part of Courtright until his disappearance in January, 1986.

Fireman's Fund contends that there is a question of fact as to whether there is coverage under the Bond because IPCA learned of the alleged dishonest acts of Courtright considerably prior to February 13, 1986, the date notice was first given to Fireman's Fund, and this action was not initiated within twenty-four months of the date that IPCA first learned of the loss.

Fireman's Fund sets forth the following facts which it claims were known to IPCA prior to Courtright's disappearance in support of its contention that a material issue of fact exists as to its defense of discovery and notice:

1. 1981, 1982 and 1983 tax returns for CCC contained financial information different in significant respect from the information contained in the financial statements submitted by CCC in support of its loans.

2. CCC's loan balance exceeded the credit limit on its loan on numerous occasions and CCC issued draft [sic] in excess of approved limits. On occasions (more frequent as time went on) the borrower would draw funds in excess of the loan limit and at the same time mail a payment drawn on its commercial account.

3. CCC failed to comply with various loan agreement covenants.

4. There were frequent large budget variances and requests for additional advances and extensions.

5. There were inconsistencies and unexplained entries on the monthly reports submitted by the borrower.

6. Information regarding cattle ownership as submitted in writing and orally by the borrower was on occasions inconsistent, and on at least one occasions [sic] was different from that determined by the PCA's own inspection.

Memorandum in Opposition to IPCA's Motion for Summary Judgment, pp. 29–30. In addition, Fireman's Fund relies upon the fact that it raised concerns during the loan approval process in 1985, and, among other new requirements, a count of 100% of the cattle was made a condition of the loan.

IPCA admits that these facts may be material to show that IPCA should have discovered the loss at a time earlier than it did, but that there is no evidence that it actually discovered the loss before the disappearance of Courtright. IPCA asserts that under these facts and the applicable legal standard, Fireman's Fund has no defense of discovery and notice.

Both IPCA and Fireman's Fund cite the court to the cases of *American Sur. Co. of New York v. Pauly*, 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977 (1898) (*Pauly I*), and *American Sur. Co. of New York v. Pauly*, 170 U.S. 160, 18 S.Ct. 563, 42 L.Ed. 987 (1898) (*Pauly II*). In *Pauly I*, the cashier of the insured bank fraudulently credited money to the account of the bank president. Shortly thereafter, the Comptroller of the Currency placed the bank into receivership. A general examination of the bank's books from January to March, 1892 indicated probable irregularities in the conduct of the bank's business. The amount and specific acts of fraud were not determined until May, 1892, at which time notice was given to the surety.

Pursuant to the terms of the bond, the insured was required to notify the surety "of any act on the part of the employe which may involve a loss for which the company is responsible hereunder, as soon as practicable after the occurrence of such act shall have come to the knowledge of the employer." *Id.* 170 U.S. at 136, 18 S.Ct. at 553–54. The Supreme Court approved the jury instruction that:

It is not sufficient to defeat the plaintiff's right of action upon the policy that it be shown that the plaintiff may have had suspicions of dishonest conduct of the cashier; but it was plaintiff's duty,

under the policy, when it came to his knowledge, when he was satisfied that the cashier had committed acts of dishonesty or fraud likely to involve loss to the defendant under the bond, as soon as was practicable thereafter to give written notice to the defendant.... And in considering this issue you are to inquire, first, when it was that the plaintiff became satisfied that the cashier had committed dishonest or fraudulent acts which might render the defendant liable under this policy. He may have had suspicions of irregularities; he may have had suspicions of fraud; but he was not bound to act until he had acquired knowledge of some specific fraudulent or dishonest act which might involve the defendant in liability for the misconduct.

*Id.* at 145, 18 S.Ct. at 557.

In *Pauly II*, the court explained:

In our judgment, for the reasons stated in the opinion in the former case, it was proper to instruct the jury that the receiver need not have given the required notice on mere suspicion as to acts by Collins involving fraud or dishonesty on his part as president of the bank, but was bound to do so only when satisfied that he had committed some specific act of fraud or dishonesty, likely to involve loss to the company.

170 U.S. at 164, 18 S.Ct. at 564.

Fireman's Fund relies upon two cases which consider the duty of an insured to make inquiry. *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Cos.*, 748 F.2d 118 (2d Cir.1984), and *Boston Mut. Life Ins. Co. v. Fireman's Fund Ins. Co.*, 613 F.Supp. 1090 (D.Mass.1985). In both of these cases, the court was called upon to examine the issue of when an insured will be held to have discovered a loss by virtue of having known facts which later become the basis of a claim. In each case, the insured argued that it had maintained a good faith belief in the honesty of the individual later found to be fraudulent. In *Utica*, the court explained:

Although Utica is correct that mere suspicions do not trigger the notice requirement, an insured cannot disregard the known facts. "[W]hen the insured learns the facts constituting the alleged dishonesty[,] his prior suspicions, if any, are converted to knowledge which he cannot ignore and which constitutes 'discovery.'"

....

Adopting Utica's arguments concerning when a loss is discovered would broaden the definition of discovery and would effectively eliminate the insured's duty to inquire into the facts. It would permit the insured to avoid making a reasonable assessment of the information presented, and would undermine the ability of the insurer to make a timely investigation and adjust its reserve funds.

*Id.* at 123 (citation omitted).

The Ninth Circuit Court of Appeals recently addressed the issue of discovery under fidelity bonds in *California Union Ins. Co. v. American Divers. Sav. Bank*, 948 F.2d 556 (9th Cir.1991). In *California Union*, the insurer argued that discovery under the bonds did not occur prior to the dates the bonds expired, while the FSLIC argued that there was a genuine issue for trial as to whether discovery occurred prior to the dates the bonds expired. The discovery provision in the bonds in *California Union* provided that "[d]iscovery occurs when the Insured becomes aware of facts which would cause a reasonable person to assume a loss covered by the bond has been or will be incurred even though the exact amount or details of loss may not be known." *Id.* at 563. The Court of Appeals stated:

FSLIC's evidence does not create a genuine issue for trial. The record is devoid of any specific evidence indicating that facts supporting a conclusion that an actual loss occurred were brought to the attention of the non-wrongdoing employees. While arguably the evidence indicates the Insured was aware of infractions of banking regulations, and perhaps that internal banking procedures were not followed, there is no indication from the record that the non-wrongdoing employees were "aware of facts which

would cause a reasonable person to assume a loss covered by the bond [had] been ... incurred...." Also noticeably absent from the record is any testimony to indicate that a non-wrongdoing employee had knowledge of dishonest acts committed by Sahni or Day. FSLIC does not present any specific facts to indicate any knowledge beyond suspicion on the part of the Insured that covered losses occurred.

*Id.* at 564–65.

The Bond in this case requires that IPCA give notice to Fireman's Fund "[a]t the earliest practicable moment after discovery of any loss." Pursuant to case law, the earliest practicable notice is when the insured has "acquired knowledge of some specific fraudulent *or* dishonest act which might involve the defendant in liability for the misconduct." *Pauly I,* 170 U.S. at 145, 18 S.Ct. at 557.

The loss to IPCA here was a result of "Courtright's failure to disclose the fraud perpetrated in obtaining loans." *Interstate Prod.,* 944 F.2d at 539. The loss to IPCA was not the result of poor credit administration or poor judgment in approving a loan that was not profitable. Viewing the evidence most favorably to Fireman's Fund, the court must determine whether there is a genuine issue of fact for trial as to whether discovery by IPCA of Courtright's failure to disclose the fraud he perpetrated in obtaining the loans occurred before the initial notice of February 13, 1986.

The evidence in the record shows that the predecessor of IPCA, the Federal Intermediate Credit Bank of Spokane (FICB), had concerns over the profitability of the loans made to CCC. When CCC applied for a revolving line of credit in 1985, the FICB deferred its decision on the loan application and listed as major areas of concern the continued trend of increasing carry-over, inadequate listing of accounts receivable, and non-compliance with the loan agreement. While the line of credit was approved on February 8, 1985, increased verification procedures were specified, including an annual count of all of the cattle.

The evidence in the record indicates that as early as the spring of 1985, the FICB indicated concern over the credit administration of the loans at the Portland Northwest Livestock PCA office which managed the CCC loans. However, the record is devoid of any evidence that there was even a suspicion that Courtright was committing and concealing fraud that would result in any losses to IPCA.

Fireman's Fund relies upon the deposition testimony of Arnold Morton, one of the members of the loan committee of the FICB who helped determine the 1985 deferral, in support of its position of an earlier discovery. Morton recalled at the time of the taking of his deposition that he was concerned that the loan had been submitted on a very narrow security margin and that he questioned the amount of cattle feed that was to be pledged as security. Morton testified as follows:

Q. Any additional concerns that you had with regard to that loan?

A. Not really, I mean, what I mean by that is that my concern overall was, did the PCA really know what was going on in that loan.

Q. That was your concern in late 1984?

A. Yes.

Q. When you say did the PCA really know what was going on with the loan, can you be more specific?

A. Well, I think we tried to express that earlier or it became expressed within that—in our requirements in that we personally—I was questioning whether they really knew whether the thing was functioning as it appeared to on the paper. And *it's more of a feeling than any facts that we have other than those facts that are expressed within those documents that are used to make loan decisions.*

Deposition of Arnold Morton, pp. 78–79 (emphasis added).

This type of suspicion is not probative on the issue of whether the fraud was or should have been discovered before 1986. While there were problems with credit administration which caused a *feeling* of con-

cern, there are no *facts* to support a claim that IPCA failed to give notice to Fireman's Fund "[a]t the earliest practicable moment after discovery of any loss" that was caused by Courtright's fraud. In addition, there are no facts in this record that any non-wrongdoing employee of IPCA disregarded any known facts in a reckless manner or in an unreasonable manner relating to this loss.

The court finds that IPCA is entitled to summary judgment in its favor as to the affirmative defense of discovery and notice.

### 2. Breach of Covenant of Good Faith and Fair Dealing

■ Fireman's Fund contends that there is a duty of good faith and fair dealing implied in every contract, and that IPCA breached that duty by making loans to CCC which were in violation of the regulations, policies and credit requirements of IPCA.

IPCA argues that an insured is required to act honestly and to comply with the provisions of the insurance contract. IPCA asserts that the affirmative defense of breach of the implied covenant of good faith and fair dealing raised by Fireman's Fund is actually a claim of contributory negligence, and that, as a matter of law, there can be no claim of contributory negligence in the context of a fidelity bond or other first party insurance coverage.

In *Best v. United States Nat'l Bank of Or.*, 303 Or. 557, 739 P.2d 554 (1987), the court stated that the purpose of the implied covenant of good faith and fair dealing is to prohibit improper behavior in the performance and enforcement of contracts and to effectuate the reasonable contractual expectations of the parties. There are no facts in this record to support the claim of Fireman's Fund that IPCA did not act in good faith and deal fairly in the administration of this loan.

The court finds that IPCA is entitled to summary judgment in its favor as to the affirmative defense of Fireman's Fund that IPCA breached the implied covenant of good faith and fair dealing in the Bond by making loans to CCC which were in violation of the regulations, policies and credit requirements of IPCA.

### 3. Other Insurance

■ The "other insurance" clause, at Section 9 of the Bond, states, in relevant part:

> If the Insured carries or holds any other insurance or indemnity covering any loss covered by this bond, the Underwriter shall be liable hereunder only for that part of such loss which is in excess of the amount recoverable or recovered from such other insurance or indemnity.

Exhibit C to Defendant's Statement of Material Facts, pp. 13–14.

The "other insurance" policies involved in this action are 1) the Commercial Union bond which the Fireman's Fund bond replaced; and 2) the Aetna bond which replaced the Fireman's Fund bond.

The parties agree that the discovery period under the Commercial Union bond expired on December 31, 1985. This court has concluded that there is no genuine issue of material fact to support IPCA's claim that it discovered the fraud perpetrated by Courtright prior to his disappearance in mid-January, 1986. Coverage under the Commercial Union bond does not affect this action.

The Aetna bond became effective after June 22, 1985. The issues in this case do not involve any damages incurred after June 22, 1985. Therefore, the Aetna bond is not relevant to the issues in this case.

The court finds that IPCA is entitled to summary judgment in its favor as to the affirmative defense of Fireman's Fund relating to other insurance.

### Damages

Even if its affirmative defenses do not otherwise defeat coverage under the Bond, Fireman's Fund asserts that it is entitled to summary judgment or partial summary judgment on the issue of damages on the following grounds: 1) there was no loss sustained by IPCA prior to June 22, 1985 when the Bond issued by Fireman's Fund was cancelled; 2) the money loaned to CCC after June 22, 1985 does not constitute a

loss sustained under the Bond; 3) the Bond excludes recovery of $4,551,691 of the losses sustained prior to June 22, 1985, as that sum represents loan proceeds used to pay accrued interest, and accrued interest is excluded under the potential income exclusion of the Bond; and 4) the Bond does not cover the loss of $4,250,000 sustained prior to Courtright's becoming a director in February, 1982.

Courtright was the officer of CCC who controlled the actions of CCC. The FICB made its first loan to CCC, IPCA's predecessor in interest, in the 1970's.

Courtright was first elected to the board of directors of IPCA on February 19, 1982 and remained a director of IPCA until the fall of 1985. As of February 19, 1982, the date that Courtright became a director of IPCA, the balance of the loan to CCC, exclusive of accrued interest, was $4,722,-225.

Courtright has admitted that he misrepresented the size of the cattle inventory of CCC in documents submitted to IPCA in order to secure extensions of the loan and increases in the loan limits. Courtright has admitted that he began to inflate the cattle inventory of CCC as early as late 1981. The fraud perpetrated by Courtright first came to light when he disappeared in January, 1986 and IPCA took steps to recover on the loan to CCC. IPCA gave Fireman's Fund notice of its claim on the Bond in February, 1986 and submitted its proof of claim to Fireman's Fund in January, 1987.

The Court of Appeals found that Fireman's Fund is liable under the Bond for Courtright's failure to disclose his knowledge of the fraudulent representations in the loan applications submitted by CCC. The Bond provides coverage for "[a]ny direct financial loss through any dishonest or fraudulent act of any employee(s)." Exhibit C to Defendant's Statement of Material Facts, p. 2. The Bond became effective January 1, 1984 for covered losses "sustained by the Insured at anytime [sic], but discovered during the policy period or extended discovery period." *Id.* The Bond was cancelled by Fireman's Fund effective June 22, 1985. At that time, IPCA exer-

cised an option to elect a twenty-four month extended discovery period within which to discover any losses sustained while the Bond was in effect.

Under the holding of the Court of Appeals, Fireman's Fund is liable under the Bond for any financial losses to IPCA which were caused by Courtright's failure to disclose his fraud from February 19, 1982, when Courtright became a director of IPCA, until June 22, 1985, when Fireman's Fund cancelled the Bond.

### 1. Summary Judgment for Fireman's Fund Based Upon a Novation

■ Initially, Fireman's Fund argues that there was no loss sustained by IPCA prior to June 22, 1985, the date of the cancellation of the Bond, because Courtright, as president of CCC, signed a promissory note on November 27, 1985 on behalf of CCC payable to IPCA in the amount of $11,902,175, which extinguished any prior obligation that CCC had had to IPCA. Fireman's Fund argues that the damages sought by IPCA in this action arise from and are created by the promissory note signed on November 27, 1985. Because the Bond was cancelled on June 22, 1985, Fireman's Fund argues that the loss arising from this debt assumed on November 27, 1985 is not a loss covered by the Bond.

Fireman's Fund contends that, as a matter of law, the promissory note signed on November 27, 1985 was a novation which replaced and extinguished the earlier promissory note which was dated February 9, 1985, and that Fireman's Fund could not be responsible for the loss resulting from a debt which was incurred after the earlier promissory note was cancelled and replaced.

IPCA argues that there was no novation after the termination of the Bond. IPCA argues that undisputedly the transactions between CCC and IPCA represented a continuing, revolving line of credit; that the loan agreement of November 27, 1985 includes the balance remaining on the loan transaction of February 9, 1985 and expressly incorporates the terms of the loan transaction of February 9, 1985; and that

there is no evidence that the promissory note signed on November 27, 1985 was ever intended to extinguish the earlier promissory note signed on February 9, 1985.

■ The giving of a promissory note does not extinguish the debt for which it was given unless the parties have intended or agreed that this be so. *Doyle v. Chladek,* 240 Or. 598, 610, 401 P.2d 18, 403 P.2d 381 (1965). The promissory note executed on November 27, 1985 reflects no agreement of the parties to extinguish the prior indebtedness for which the promissory note was given. On the contrary, the express language of the loan agreement of November 27, 1985 reflects the intent of the parties that the transaction of November 27, 1985 increase the loan limits and renew or carry over the indebtedness of CCC. The loan agreement of February 9, 1985 is made a part of an addendum executed November 27, 1985 with the promissory note. The addendum expressly states that "[t]his Addendum shall be attached to and form a part of said Loan Agreement. Except as amended herein, all other terms and conditions shall remain in full force and effect." Exhibit 271 to Plaintiff's Statement in Opposition to Defendant's Motion for Summary Judgment.

The court finds as a matter of law that the promissory note of November 27, 1985 was not a novation which extinguished any indebtedness which CCC owed to IPCA. Fireman's Fund's motion for partial summary judgment on the grounds that IPCA incurred no loss prior to June 22, 1985 is denied.

2. Partial Summary Judgment for Fireman's Fund Based Upon FIFO

■ The parties disagree as to the proper method for determining the maximum loss sustained by IPCA as of June 22, 1985, the date the Bond was terminated.

Fireman's Fund moves the court for partial summary judgment and a ruling that, at the most, IPCA sustained a loss covered by the Bond not in excess of $1,534,639.

IPCA, in contrast, argues that it is entitled to recover under the Bond the sum of

$9,056,465, plus prejudgment interest through December 12, 1991 of $3,991,095, for a total of $13,047,560, plus interest of $2,183 per day thereafter.

Fireman's Fund argues that payments made by CCC after June 22, 1985 should be applied on a "First In–First Out" (FIFO) basis. Using FIFO as a basis, Fireman's Fund contends that the monies paid by CCC after June 22, 1985 toward the loans are applied first to the outstanding interest, then to the earliest outstanding borrowings, and lastly to the most recent borrowings. Since CCC continued to borrow money after June 22, 1985, and continued to make payments after June 22, 1985, the FIFO method advanced by Fireman's Fund would result in applying the payments made by CCC after June 22, 1985 toward paying off the earliest borrowings.

Fireman's Fund asserts that the method of accounting which is referred to as FIFO makes sense under the circumstances of the CCC loan. Fireman's Fund explains that the CCC loan was primarily secured by cattle which were fattened and sold over a several month period of time. Proceeds from the sale of the cattle were anticipated as the major source of repayment of the loan. At some point in time, the cattle that existed as of June 22, 1985 were sold off and replaced with different cattle. This new collateral replaced the old collateral; loan payments were made from the sale of the old collateral; and loan proceeds were used for the purchase of the new collateral.

Fireman's Fund argues that proceeds generated from the sale of the old collateral (cattle that existed as of June 22, 1985) should be applied first to the oldest debt and then to the more current debt as the FIFO accounting method requires. Fireman's Fund asserts that payments made after June 22, 1985 are most appropriately applied to the oldest debt and not to the debt incurred after June 22, 1985.

IPCA argues that this method of calculating loss is not reasonable because it ignores the fact that CCC continued to borrow monies after June 22, 1985, and IPCA applies the payments made after June 22,

1985 exclusively to monies borrowed prior to June 22, 1985. IPCA points out that the FIFO system of crediting payments applies only as a matter of presumption, in the absence of the customary and normal business practices of the parties. In his affidavit, James O. Hanson explains the customary and normal business practices used by IPCA as follows:

> The customary and normal business practice of Northwest Livestock PCA[, predecessor of IPCA,] from its inception until January 1, 1984, was to apply repayments of its loans to the outstanding principal balance first with no interest payments required until the maturity of the loan. Interest was thus expected to be paid on an annual basis since these loans were generally for a one year term. This policy was changed effective January 1, 1984, as a result of action by the Northwest Livestock PCA Board of Directors during its December 15–16, 1983, meeting.... Under the new procedure, borrowers under "roll your own", revolving lines such as Courtright Cattle Company ("CCC") were billed and were to pay interest quarterly.

> Affidavit of James O. Hanson, pp. 2–3 (attached as an Exhibit to Plaintiff's Statement in Opposition to Defendant's Motion for Summary Judgment).

IPCA offers the affidavit of Gary Levinbook, a certified public accountant, who states that, in his opinion, the total bond loss is $9,056,465. Levinbook calculates the loss by starting with the principal loan balance as of June 22, 1985. He excludes from the principal loan balance any contractual interest under the loan agreements accruing after June 22, 1985 and adjusts for the retirement of B stock. He then gives Fireman's Fund 90% credit for the net recoveries obtained through the liquidation resulting from the bankruptcy of CCC, as well as any other credits received as payment of the amounts owed, such as restitution payments by Courtright.

Levinbook explains that, in his opinion, FIFO accounting principles are not helpful in ascertaining the nature of the obligation of CCC, at any given time, under its revolving line of credit with IPCA.

Restatement of Law, Contracts, § 394, p. 743 provides, in relevant part:

> (1) Where neither the debtor nor the creditor seasonably exercises his power to apply a payment to one of several debts, the payment is applied to the earliest matured debt to which the creditor might have applied it, except that application is made to
>
> (a) a matured debt which the debtor is under a duty to a third person immediately to pay, rather than to one where he is under no such duty; or
>
> (b) if he is under no such duty,
>
> (i) to overdue interest rather than to principal; and
>
> (ii) to an unsecured or precarious matured debt rather than to one that is secured or certain of payment.

This general rule has been applied and accepted by the courts of the State of Oregon. *Fowler v. Courtemanche*, 202 Or. 413, 445, 274 P.2d 258 (1954). This general rule is consistent with generally accepted accounting principles for financial institutions. However, this general rule is not applicable in the determination of damages in this case. The court must, therefore, determine the direct financial loss to IPCA caused by the failure of Courtright to disclose his fraud from February 19, 1982, when Courtright became a director of IPCA, until June 22, 1985, when the Fireman's Fund bond was cancelled.

In *First Wisconsin Fin. Corp. v. Yamaguchi*, 812 F.2d 370 (7th Cir.1987), the court concluded that FIFO accounting principles were irrelevant to the legal issue before the court concerning loan payments on a revolving line of credit. In *Yamaguchi*, Tomkenco, Inc. was granted a line of credit by First Wisconsin Financial Corp. which was secured by its assets and accounts receivable. Yamaguchi and Kuzmenko, insiders in Tomkenco, Inc., had personally guaranteed the obligation of Tomkenco, Inc. to First Wisconsin Financial Corp.

The credit relationship began in May, 1979. By late 1980, Kuzmenko had begun

to forge evidence of Tomkenco's receivables. First Wisconsin Financial Corp. relied upon the false representations, making credit advances against the fraudulently conceived receivables.

Yamaguchi sent a letter in which he revoked his guaranty as of April 2, 1983. As of April 2, 1983, the indebtedness of Tomkenco, Inc. to First Wisconsin Financial Corp. was about $404,000. After April 2, 1983, Tomkenco, Inc. paid approximately $554,000 to First Wisconsin Financial Corp. and borrowed approximately $407,000.

The district court applied FIFO accounting principles, thereby holding that Yamaguchi was entitled to a credit of $554,000 (payments made after the revocation of the guaranty) against $404,000 (indebtedness at the time of the revocation of the guaranty), and thus had no further obligation on his guaranty. The Court of Appeals found that FIFO accounting procedures were not applicable to establish the amount of the loss guaranteed by Yamaguchi prior to the revocation of his guaranty. The court explained:

> In selecting a plan of attribution, the court must consider the nature of the parties' dealings and the effect of the accounting method on the achievement of the parties' objectives.

> The purpose of Yamaguchi's guaranty was to provide First Wisconsin a source of payment in the event Tomkenco sold to unreliable customers or committed fraud....

> Had Tomkenco dissolved on April 2, the legitimate customers would have paid up, and the bogus paper would have been Yamaguchi's responsibility. The shortfall that would have been revealed by an immediate liquidation or sale of the business was Yamaguchi's contingent liability, the amount of First Wisconsin's risk Yamaguchi was covering. Suppose the $404,000 debt on April 2 represented $100,000 in spurious paper and $304,000 in honest receivables. Then Yamaguchi was on the hook for $100,000 and should be liable unless Tomkenco found some other way to cover its debts. Whatever happened later was none of Yamaguchi's

business. The accounting rule should produce a result as close as possible to the result of a hypothetical liquidation or sale of the business to a fully informed buyer on April 2, for only such an approximation holds Yamaguchi to the amount of risk he assumed.

> The FIFO approach does poorly by this standard. Suppose Tomkenco wrote no more bogus paper, sold $600,000 worth of goods, borrowed $480,000 against the receivables, and repaid the whole $480,000 (using the other funds for the operation of its business). Under FIFO accounting the whole debt of April 2 has been retired and Yamaguchi is discharged. Yet the risk to which First Wisconsin is exposed—that it will never recover the $100,000 lent against the security of the pretended receivables—is exactly the same after these transactions as it was on April 2. There is accordingly no reason to excuse Yamaguchi. To put this differently, the application of the FIFO method will discharge guarantors as time goes by and new loans revolve, even though risk is unchanged—perhaps even, as in this case, the rate of presentation of spurious paper increases. Allowing the normal (or fraudulent) operation of the business to discharge the guarantors would give people a reason to hide their fraud as long as possible, just the opposite of the appropriate incentive. Until First Wisconsin has been relieved of the risks that came into being on Yamaguchi's watch, Yamaguchi must remain responsible.

812 F.2d at 374-75.

The measure of damages in this case is the amount of direct financial loss which was sustained by IPCA and which was caused by Courtright's failure to disclose his fraud from February 19, 1982, when Courtright became a director of IPCA, until June 22, 1985, when the bond issued by Fireman's Fund was cancelled. For the reasons explained in *Yamaguchi*, the FIFO accounting method does poorly in determining this amount.

3. Summary Judgment on Accrued Interest

■ Fireman's Fund asserts that any calculation of damages should be reduced by $4,551,691 under Exclusions, Section 2F of the Bond, which excludes from coverage "[l]oss of potential income, including but not limited to interest and dividends not realized by the Insured because of a loss covered under this bond." Exhibit C to Defendant's Statement of Material Facts, p. 10. Fireman's Fund explains that for the years 1979 through 1985, accrued interest owed on the loans in the amount of $4,551,691 was paid for with additional loan proceeds, and that any losses sustained by IPCA during the Bond period must be reduced by that amount.

IPCA agrees that accrued but unpaid interest owing on the promissory note of February 9, 1985 through June 22, 1985 should be deducted from the loan balance as of June 22, 1985. IPCA asserts that loan advances through the loan period which were used to pay accrued interest cannot become a part of the principal. IPCA's accountant, Gary Levinbook, explains that he disagrees with the assertion by Fireman's Fund that any loss sustained by IPCA during the Bond period must be reduced by $4,551,691, the amount of accrued interest paid for through the Bond period with additional loan proceeds. Levinbook states that:

> [I]f, hypothetically speaking, a financial institution makes advances to a pre-existing borrower to pay accrued interest obligations, then such further advances are not properly included in the principal loan balance. To the contrary, when IPCA made advances to CCC, such advances were properly includable in the principal loan balance in accordance with the governing transaction documents. This was true regardless of the use of the proceeds. Any advances used to pay interest were as much an asset of the institution as advances made for any other purpose of the borrower. This opinion is based on the lender's understanding at the time of the advances that the entire principal balance was fully collectible.

Affidavit of Gary Levinbook of February 2, 1990, pp. 2–3.

The court concludes that there is no basis for excluding from the amount of the loss those monies borrowed to pay interest.

4. Summary Judgment on Monies borrowed Prior to February 19, 1982

On February 19, 1982, when Courtright was first elected to the board of directors of CCC, the balance of the loan to CCC, exclusive of accrued interest, was $4,722,225. On June 22, 1985, when the bond issued by Fireman's Fund was cancelled, the loan balance, exclusive of accrued interest, was $11,745,676 less $316,346 or $11,429,330. During the period of time it was covered by the Fireman's Fund bond, CCC increased its risk of direct financial loss from $4,722,225 to $11,429,330, or by $6,707,105.

The measure of damages used should provide for a return to IPCA of the amount of direct financial loss that Courtright's failure to disclose his dishonest acts caused to IPCA from February 19, 1982 through June 2, 1985. This is a difficult task in light of the fact that Courtright's acts caused direct financial losses, both before February 19, 1982 and after June 22, 1985, but Fireman's Fund did not assume the risk of Courtright's acts outside of that time frame.

It is not appropriate to apply all payments made after June 22, 1985 under FIFO accounting principles to the first debt and ignore the fact that the fraud and the loss continued after June 22, 1985. It is also not appropriate to ignore the fact that a debt of $4,722,225 existed before any covered losses were incurred in determining the amount of damages.

Assuming that all of the increase in financial risk to IPCA was caused by the failure of Courtright to disclose his fraud during the period covered by the Fireman's Fund bond, the direct financial loss to IPCA covered by the Bond could not exceed the amount of additional risk of loss assumed by IPCA during the relevant period, or $6,707,105. This amount must further be decreased by the best estimate of

the value of the collateral securing the loan as of June 22, 1985, prorated over the entire debt owed at that time, as well as the deductions for the value of the B-stock and the deductible in the policy.

*Prejudgment Interest*

██ IPCA asserts that it is entitled to statutory interest at the rate of 9% per year commencing on March 28, 1987, the day following the last date on which Fireman's Fund could make payment without statutory interest beginning to accrue. Fireman's Fund opposes an award of prejudgment interest on the grounds that the damages in this case were not ascertained or readily ascertainable.

██ O.R.S. 82.010(1) states, in relevant part, that "[t]he rate of interest for the following transactions, if the parties have not otherwise agreed to a rate of interest, is nine percent per annum and is payable on: (a) All moneys after they become due...." Prejudgment interest may be awarded on unliquidated damages for breach of contract when the damages are either ascertained or readily ascertainable and if the date from which prejudgment interest runs is also easily ascertained. *Banister Continental Corp. v. Northwest Pipeline Corp.*, 76 Or.App. 282, 292, 709 P.2d 1103 (1985).

In this case, neither the issue of liability nor the issue of damages was without substantial, reasonable controversy. The court finds, as a matter of law, that the damages in this case were not ascertained or readily ascertainable. The court will not award prejudgment interest.

## CONCLUSION

The court finds that Fireman's Fund's affirmative defenses of discovery and notice, breach of good faith and fair dealing, and other insurance are not supported by any credible evidence in this record, and that summary judgment in favor of IPCA should be granted as to these affirmative defenses. The amount of damage to IPCA is the direct financial loss to IPCA from February 19, 1982 to June 22, 1985. The amount of damage to IPCA cannot exceed the amount of additional risk of loss as-sumed by IPCA during the relevant period, or $6,707,105. This amount must further be decreased by the best estimate of the value of the collateral securing the loan as of June 22, 1985, prorated over the entire debt owed at that time, as well as the deductions for the value of the B-stock and the deductible in the policy already agreed to by the parties.

The parties shall consult and attempt to agree as to the amount of damages based on this opinion. Any agreement as to the amount of damages shall not be construed by this court or by any other court as any concession of a contrary position taken at any earlier time in this case. The parties have thirty days to attempt to resolve this issue. At the end of thirty days, if no agreement can be reached as to the amount of damages based upon the court's rulings herein, the parties shall present to the court their contentions, and the court will make further rulings.